SIOBHAN C. AMIN (CA Bar No. 308416)
samin@ftc.gov
BARBARA CHUN (CA Bar No. 186907)
bchun@ftc.gov
JORDAN NAVARRETTE (CA Bar No. 306143)
jnavarrette@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

*Attorneys for Plaintiff Federal Trade Commission*

[Additional Attorneys for Plaintiffs Listed on Next Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

FEDERAL TRADE COMMISSION; THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through LOS ANGELES COUNTY COUNSEL DAWYN R. HARRISON; and UTAH DIVISION OF CONSUMER PROTECTION,

Plaintiffs,

v.

HIMS & HERS HEALTH, INC.,

Defendant.

Case No. 3:26-cv-07871-VC

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**

DAWYN R. HARRISON, County Counsel
JON SCOTT KUHN, Assistant County Counsel
(CA SBN 190517) • skuhn@counsel.lacounty.gov
ANDREA ROSS, Principal Deputy County Counsel
(CA SBN 179398) • aross@counsel.lacounty.gov
HANNAH FLORES, Deputy County Counsel
(CA SBN 305873) • hflores@counsel.lacounty.gov
PETER S. LEE, Senior Deputy County Counsel
(CA SBN 290846) • plee@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012-2713
Telephone: (213) 808-8747
Facsimile: (213) 680-2165

CHRISTINA TUSAN (CA SBN 192203)
ctusan@ctusanlaw.com
ADRIAN BARNES (CA SBN 253131)
abarnes@ctusanlaw.com
TUSAN LAW, P.C.
680 E. Colorado Blvd., #180
Pasadena, CA 91101
Telephone: (626) 418 8203

*Attorneys for Plaintiff People of the State of California*

DEREK E. BROWN
UTAH ATTORNEY GENERAL
Douglas Crapo (Utah Bar No. 14620) (*pro hac vice*)
Public Protection Deputy Attorney General
Alexandra Butler (Utah Bar No. 19238) (*pro hac vice*)
Daniel Ruskin (Utah Bar No. 20360) (*pro hac vice*)
Assistant Attorneys General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0310
crapo@agutah.gov
alexandrabutler@agutah.gov
druskin@agutah.gov

*Attorneys for Plaintiff Utah Division of Consumer Protection*

Plaintiffs, the Federal Trade Commission ("FTC"), the People of the State of California, acting by and through Los Angeles County Counsel Dawyn Harrison (the "People of the State of California"), and the Utah Division of Consumer Protection (the "Division") (collectively, "Plaintiffs"), for their Complaint allege:

1. Plaintiff the FTC brings this action for Hims & Hers Health, Inc.'s ("Hims'") violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

2. Plaintiff the People of the State of California brings this action against Hims for injunctive relief, restitution, and civil penalties for Hims' acts or practices in violation of California's Business and Professions Code section 17200 *et seq.* (the "Unfair Competition Law" or "UCL") and the Business and Professions Code section 17500 *et seq.* (the "False Advertising Law" or "FAL").

3. Plaintiff the Division brings this action for Hims' violations of the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-4(1). For these violations, Plaintiff seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to the Utah CSPA, Utah Code § 13-11-17(1).

## SUMMARY OF THE CASE

4. Hims is an online telehealth company that has misled hundreds of thousands of consumers by charging them for unwanted prescription medication subscriptions without their express informed consent. Hims' advertising and online medical intake forms mislead consumers into believing that, when submitting their intake form for review by a medical provider, they are not obligated to purchase or subscribe to the provider's recommended treatment. Hims' advertising and medical intake forms also misrepresent that consumers can consult with Hims' medical providers about their treatment recommendations free of charge in order to determine whether a treatment is "right" for them.

5. Contrary to Hims' representations, Hims routinely charges consumers for

prescription treatments and enrolls them in subscription plans for those treatments almost immediately after receiving consumers' medical intake forms. Consumers have virtually no opportunity to review the provider's recommended treatment, much less consent to it. Accordingly, consumers have suffered, and continue to suffer, significant injury by being forced to pay for medical treatment that they did not consent to or wish to purchase. Despite years of receiving complaints from consumers about their lack of consent, Hims has continued to use misleading language in its advertising and intake forms and has continued to immediately charge consumers without their express informed consent. In fact, Hims' policies have specifically ensured that consumers complaining of their lack of informed consent are not refunded for significant unwanted charges, even if their medications have not yet shipped.

6. Hims has also caused consumers to face unwanted refill charges and made it difficult for them to cancel their subscriptions. First, Hims fails to clearly and conspicuously disclose to consumers the dates upon which they will face recurring charges for refills in their subscription. As a result, consumers who have lacked notice of Hims' refill charge dates have missed deadlines to avoid refill charges and been forced to pay for refills of medications that they did not want. Second, Hims made it difficult for consumers to cancel their subscriptions. For years, consumers struggled to successfully cancel and stop recurring charges because of the methods of cancellation Hims offered, leading to failed cancellations, lost time, and unwanted charges. Despite being aware of consumers' struggles, Hims repeatedly chose not to provide simple mechanisms for consumers to stop recurring charges for medications they no longer want. Instead, Hims spent years unlawfully refusing to provide most consumers with simple cancellation mechanisms because its own research showed that offering simple cancellation mechanisms would materially harm its bottom line.

7. Finally, Hims has also assured consumers that Hims' platform offers consumers a "100% online, private, and secure" process and that consumers' sensitive health information would only be accessed by Hims' medical providers—leading consumers to believe that Hims would not disclose consumers' health information to third parties without their consent. But those assurances were false or misleading. Instead of honoring its privacy promises, Hims opted to grow the company and increase its revenue streams by sharing millions of consumers' private health

information—including information about consumers seeking treatment for erectile dysfunction and mental illness—with advertising platforms such as Meta and Snap.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and has supplemental jurisdiction over the state law claims asserted by the People of the State of California and the Division pursuant to 28 U.S.C. § 1367(a).

9. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## DIVISIONAL ASSIGNMENT

10. Assignment to the San Francisco or Oakland Division is proper. This action arises in the City and County of San Francisco because a substantial part of the events giving rise to these claims occurred in the City and County of San Francisco, where Hims' headquarters is located.

## PLAINTIFFS

11. The FTC is an agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which prohibits charging or attempting to charge consumers for any goods or services sold in a transaction effected on the Internet through a negative option feature without meeting requirements for disclosure, consent, and simple cancellation mechanisms to protect consumers. A negative option is an offer in which the seller treats a consumer's silence—i.e., their failure to reject goods or services or cancel an agreement—as acceptance of the offer. 16 C.F.R. § 310.2(w).

12. Plaintiff the People of the State of California bring this case by and through Los Angeles County Counsel Dawyn R. Harrison, who is authorized by California Business and Professions Code sections 17535 and 17536 to enforce the California False Advertising Law, California Bus. & Prof. Code § 17500 *et seq*., and authorized by California Business and Professions Code sections 17204 and 17206 to enforce the California Unfair Competition Law, California Bus. & Prof. Code § 17200 *et seq*. The People bring this enforcement action to, among

other things, obtain injunctive relief, restitution, and civil penalties for Defendant's acts or practices in violation of California's Unfair Competition Law and False Advertising Law.

13. The Division is a state agency within the Utah Department of Commerce. Utah Code § 13-2-102. The Division enforces Utah's consumer protection laws, including the Utah CSPA, which prohibits deceptive acts and practices in connection with consumer transactions. Utah Code §§ 13-2-102(2), 13-11-4, 13-11-5, 13-11-17.

**DEFENDANT**

14. Defendant Hims & Hers Health, Inc. is a Delaware corporation with its principal place of business at 2269 Chestnut Street, #523, San Francisco, California. Hims offers prescription and non-prescription medical treatments on a negative-option basis. Hims transacts or has transacted business in this District and throughout the United States, including in Los Angeles County, California and in the State of Utah. At all times relevant to this Complaint, acting alone or in concert with others, Hims has advertised, marketed, distributed, or sold medical treatment to consumers throughout the United States.

**COMMERCE**

15. At all times relevant to this Complaint, Hims has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANT'S BUSINESS ACTIVITIES**

**I. Hims' Online Telehealth Business**

16. Hims launched in 2017 to address medical conditions exclusively via telehealth. Originally founded to address men's health, Hims launched its first website, "ForHims.com," in or around November 2017 (now "Hims.com"). On or around November 2018, Hims added a sister brand "Hers" (formerly "ForHers"), located at "forhers.com," to address women's health.

17. Hims offers medical treatment for specific conditions targeted towards male consumers on the Hims website and app (the "Hims Platform") and female consumers on the Hers website and app (the "Hers Platform" and collectively, with the Hims Platform, the "Hims Platforms"). Hims has expanded its offerings over time to include treatments for sexual health, hair

loss, skin, mental health, and weight loss. Hims' treatments primarily consist of prescription medications that Hims sells directly to consumers. However, Hims itself is not a pharmacy. Instead, Hims either owns or contracts with pharmacies to fulfill and ship its prescription products. Hims is also not a medical provider. Instead, it contracts with medical providers (doctors and nurse practitioners) to provide medical services to consumers. Thus, Hims acts as an intermediary between consumers, on the one hand, and Hims' partner pharmacies and medical providers, on the other. For example, Hims collects information from consumers and transmits that information to its partner medical providers, and consumers can only contact those providers through the Hims Platforms. Similarly, Hims sends consumers' prescriptions to its partner pharmacies, and consumers cannot order prescriptions from these partner pharmacies directly.

18. Hims always sells its prescription products as part of a subscription. A consumer seeking prescription medication treatment must go through an online medical intake form ("Intake Flow") that will ultimately determine their eligibility for Hims' prescription treatments.

19. The Intake Flow is split into four parts. First, the consumer answers a series of approximately 5 to 15 questions regarding their treatment interests and goals. Second, the consumer registers with the Hims Platforms by creating an account with personal login information. Third, the consumer completes a medical assessment consisting of between 25 and 50 questions regarding the consumer's medical history. Fourth, the consumer is presented with a series of screens where Hims displays a potential treatment that a medical provider may prescribe, along with the price and frequency of the refill shipments. The screens then direct the consumer to input their billing and shipping information and, at the end of the Flow, click a button to submit their Intake Flow for review by a medical provider.

## II. <u>Hims Misleads Consumers Regarding Whether and When They Will Be Charged and Subscribed</u>

### A. Hims Attracts Potential Consumers to Its Platforms by Misleadingly Promising the Opportunity to Consult with a Medical Provider Regarding Their Treatment Recommendation

20. Hims has advertised its services and products extensively on social media, television, radio, and podcast programs. Since at least 2019, these advertisements have, in many instances, represented to consumers that the medical consultations provided via the Hims Platforms are "free."

21. For example, Hims' online advertisements (like the one shown below in Image 1) have frequently represented that Hims provides a "free consult" in which the consumer and a medical provider can "connect" to determine whether the consumer needs prescription medication and, if so, what medication should be prescribed.




**Image 1 - "Start Your Free Consult" Advertisement**

22. Hims' offline advertisements (e.g., TV and radio) have contained similar representations promising consumers "free consultations."

23. Consumers who visit the Hims Platforms have seen similar representations on the homepages of those Platforms before seeking treatment. For example, between at least 2021 and

2023, the Hims Platform homepage advertised that Hims offered “[f]ree, expert consultation[s]” and “free online visit[s]” as part of its medical treatment service. From at least early 2023 to early 2024, this homepage similarly stated, “Your free online visit starts here,” at the top of the page, with a call-to-action button under that statement inviting the consumer to “find [their] treatment.” Hers customers have seen similar representations on the Hers Platform homepage, such as representations promising consumers a “free assessment” by a medical provider.

24. Hims’ advertisements and webpages have also promised consumers that they can consult with a provider on the Hims platform to find a treatment that is “right for them.” For example, Hims has represented to consumers that, on the Hims Platforms, they will be able to “connect with a licensed medical provider to get a customized care plan that’s right for you” or “see if treatment is right for [them].”

25. Once a consumer selects the type of medical treatment that they are interested in on the homepages of the Hims Platforms, the consumer then typically starts the relevant Intake Flow, where they often see representations like those described above. These have included representations such as “Free provider diagnosis: A licensed medical provider will assess what you shared today to determine if treatment is right for you,” “free provider evaluation,” and “free assessment.”

26. Then, towards the end of Hims’ Intake Flows, Hims represents to consumers that no payment is required when they submit their information for review by a medical provider. For example, as shown in Image 2 below, Hims’ final call-to-action button has represented “Due Now - $0” and “Pay $0 today.” In addition, these screens frequently assure consumers that, by submitting their Intake Flow for review by a provider, they are not yet agreeing to purchase any prescription, with statements such as “Save your payment details—you won’t be charged until prescribed” and, in bolder text, “You will only be charged if prescribed,” also shown in Image 2 below.




**Image 2 - Hers Anxiety & Depression Intake Flow Final Screen**

27. However, contrary to Hims' promises, Hims does not provide most consumers with the opportunity to consult with a provider. Instead, by submitting their Intake Flow, most consumers are unknowingly agreeing to pay for and subscribe to an as-yet-undetermined prescription treatment without having a chance to review the proposed treatment. Specifically, after submitting their Intake Flow, most consumers do not actually receive a consultation with a medical provider, whether live or asynchronous. They cannot have a dialogue with the provider about the treatment recommendation, inquire about alternatives, elaborate on issues raised in the Intake Flow, reflect on whether the recommended treatment is "right for them," or ultimately agree to or decline to proceed with the prescription. Instead, Hims' providers regularly and unilaterally prescribe a treatment without offering the consumer a consultation, at which point Hims immediately charges the consumer for the prescription, sends the prescription for fulfillment, and enrolls the consumer in a subscription treatment plan without receiving the consumer's express informed consent.[1] Consequently, most consumers have already been charged for and enrolled in a subscription before they even learn what treatment the provider has recommended.

**B. Hims Fails to Clearly and Conspicuously Disclose If and When Consumers Will Be Charged and Subscribed and Thus Fails to Obtain Their Express Informed Consent**

28. Hims requires, as the last step of the Intake Flow, that consumers provide Hims with their billing information. As described above, in most states, Hims charges consumers who are eligible for treatment immediately after a provider reviews their Intake Flow, chooses a treatment, and enrolls them in a subscription for the same. However, Hims' disclosures purporting to advise consumers of these practices before collecting their billing information have not been clear or conspicuous.

29. First, Hims' disclosures to consumers regarding its charging practices before collecting their billing information have not been clear. During the Intake Flow, Hims encourages

---

[1] This practice affects consumers in most states because most states do not require real-time (synchronous) telehealth consultations. In states without that requirement, contrary to its advertisements, Hims permits its providers to review consumers' Intake Flows and prescribe medications without any subsequent interaction with the consumer.

consumers to "[s]ave your payment details" by reassuring them that they "won't be charged until prescribed," as shown in Image 2. Hims also leads consumers to conclude that submitting their Intake Flow is risk-free by prominently advertising "Due Now $0" and labeling the submission button with "Pay $0 today." These vague and conditional statements are misleading because they fail to inform consumers that, upon submitting their Intake Flow, they are agreeing in advance to a binding charge and automatic subscription enrollment as soon as a provider recommends a treatment on the Hims Platform.

30. Second, Hims' disclosures to consumers regarding its charging practices before collecting their billing information have not been conspicuous. For example, while Hims has disclosed to consumers that "if prescribed medication, you are purchasing an automatically-renewing subscription," as shown in Image 2, this disclosure is only in small, low-contrast font *below* the final call-to-action button that a consumer must press to submit their Intake Flow for review. Even if the consumer were to see this buried disclosure, it still uses the unclear "if prescribed" language, which creates ambiguity as to if and when that enrollment will occur.

31. Hims has further consistently failed to clarify for consumers if and when they will be charged and subscribed after collecting consumers' billing information. Prior to 2025, following submission of the Intake Flow, consumers typically received notifications or saw website and in-app screens indicating the status of their submission. However, these notifications did not mention if or when a consumer would be charged at all. As a result, consumers remained unaware of whether or when they would incur their first charge.

32. As of late 2025, after learning of the FTC's investigation, Hims marginally improved the screen shown on the Hims Platforms after a consumer submits their Intake Flow. The screen now states in relevant part: "if approved, your prescription is charged to the card you provided and shipped to you directly." However, while this screen now uses the term "charge," it still remains ambiguous as to *when* the "approval" and consequent "charge" occurs. For example, the screen states that, before approval, the "provider will message you shortly about your prescription [and] leave you a message in your account regarding your treatment," suggesting there is still an opportunity for a back-and-forth with the provider before any prescription is approved.

33. Hims has been aware that consumers are often misled about whether and when Hims will charge them for their first order and enroll them in a subscription for prescription treatment. For example, the company received numerous complaints about this issue from customers directly as well as through organizations such as the Better Business Bureau. Additionally, Hims' customer service and social media team monitored reviews on platforms such as Trustpilot and the Apple App Store as part of their business operation. Many of these complaints and reviews expressly state that consumers did not expect to be charged or subscribed immediately upon the provider's review of their Intake Form and writing of their prescription, such as:

- "After filling out the intake form, they indicated there would be a consult with a physician and asked for a credit card information for a subscription - which I understood would be after a consult. I was prescribed and enrolled in a recurring subscription before knowing what the prescription dosage would be."
- "I was told that I would be able to speak with a doctor in a few days and that nothing would be charged to my card that day. Him's & Her's [*sic*] charged me immediately! I never gave consent to apply charges before I spoke with a healthcare professional."
- "I recently filled out a questionnaire for products. I had to entertain [*sic*] card information, but the app assured me that I would NOT be charged without my approval. 24 hours later, I have a $897 charge on my card that I did NOT approve and was NOT made aware of. I have called numerous times, waiting on hold for 15 minutes each call, and then was hung up on."
- "After completing the questionnaire, I was automatically enrolled in a topical spray treatment I did not want and did not consent to. I was never given the opportunity to consult with a licensed healthcare provider, and within minutes of this automatic enrollment, I attempted to cancel the order and subscription?? [*sic*] but was unable to do so through the website or customer service."
- "[C]ompleted a mental health assessment… The company asked for my credit card information in the scenario that a prescription was needed. It said that I would not be charged unless the prescription was ordered. [T]here was a question about whether you

are willing to take medication… I responded that I was I'm [*sic*] open to it, but I want more information. To me, this response indicates that you wouldn't automatically agree to ordering and taking the prescription. It was a surprise when I was automatically prescribed Lexapro and charged $147 for a 3-month supply."

34. In addition to reviewing consumer complaints, Hims repeatedly expressed concern in internal research that some consumers were attempting to cancel their subscriptions on the very same day that they had purportedly "enrolled" in said subscriptions upon the provider's writing of a prescription. Internally, Hims referred to those consumers who successfully navigated Hims' cancellation processes as day zero ("D0") cancellations.

35. For example, in or around June 2022, the Hims "customer insights" team prepared a comprehensive analysis of consumers' reasons for cancelling their subscriptions from various data sources Hims had been monitoring, such as cancellation surveys and customer service scores. This analysis explained that consumers who cancelled on "D0" experienced the following friction points: (1) being confused and unaware that they would not have any interaction with a medical provider before being charged; or (2) erroneously believing that they would have the ability to reject the prescription and, consequently, the charge, following a medical consultation with a provider.

36. Hims' senior executives also took notice when consumers sought to cancel their subscriptions before ever receiving their medication. For example, in 2023, when reviewing data that suggested that up to 10% of all subscription cancellations for mental health patients were occurring on "D0," Hims' CEO acknowledged that these customers were essentially being charged for something they never wanted in the first place, stating: "a near 10% D0 Cancellation is wild. Essentially it means whatever they received they did not want, right?"

37. Later, a 2024 customer insights team analysis of customers purchasing sexual health products suggested that cancellations within seven days of an initial charge could be prevented by "providing clearer communications at checkout about pricing (i.e., customer doesn't always realize he's about to pay)." Indeed, the customer insights team went so far as to create the name "checkout whiplash" for consumers' frequent complaint that they did not understand that the submission of their Intake Flow constituted an agreement to pay for and subscribe to medical treatment.

38. Hims also received responses from consumers in its post-subscription cancellation surveys which demonstrated that many consumers did not understand they were agreeing to pay in advance for an as-yet-undetermined prescription when submitting their Intake Flow. Across many of these surveys, for example, at least 10% of consumers reported that they did not realize that they were signing up for a subscription, did not want to sign up for a subscription, and/or did not consent to being charged for a subscription.

39. Despite Hims' awareness that many consumers do not understand they are purchasing a subscription by submitting their Intake Flow, Hims has continued to make misleading representations to consumers in its advertising, on its websites, and in its Intake Flows.

40. Hims' awareness of the lack of consumer consent is further demonstrated by its refund policies. From at least August 2022 to at least February 2025, Hims expressly instructed its customer service agents to deny refunds to consumers who claimed they were "confus[ed]" about Hims' billing and auto-enrollment practices. Hims also instructed its customer service agents to reject requests from consumers to stop the fulfillment and shipment of their first prescription orders in nearly all circumstances, even if the product had not yet shipped. Until around August 2023, customer service agents were instructed that they were only permitted to cancel these first orders if the shipment had not yet been assigned a tracking number. From September 2023 to February 2025, however, Hims tightened this policy to provide that agents could only cancel a first prescription order if the customer's request came within an hour of when the provider had written the prescription. Consequently, many consumers who successfully cancelled their subscriptions on Day 0 were still charged for the first order of their unwanted prescription.

### C. Hims Fails to Cleary and Conspicuously Disclose When It Will Charge Consumers for Refills and Thus Does Not Obtain Consumers' Express Informed Consent to Those Refill Charges

41. Hims also fails to clearly and conspicuously disclose to consumers the dates of their refill charges. In its Intake Flows, Hims advises consumers that they will receive refill shipments at regular intervals, which are typically at monthly intervals (one, three, six, or 12 months). However, Hims does not charge consumers for these refills at the cadence that consumers select in their Intake

Flow. Instead, Hims has routinely charged for the first refill 10 days before the selected cadence (e.g., on day 20 after the initial charge for a monthly subscription) and required consumers to cancel two days before the refill date (e.g., on day 18 for a monthly subscription) to avoid the charge. Hims also elects to process some subsequent refills up to two days earlier than the advertised cadence based on holidays or "other operational reasons."

42. During the Flow—before the consumer provides their billing information and purportedly agrees to sign up for a Hims prescription subscription—Hims fails to clearly and conspicuously disclose to consumers this refill processing policy and thus its cancellation deadlines. Rather, in the Intake Flow, Hims only presents its policy of refill periods in small, low-contrast text underneath the final call-to-action button in the Flow, *see* Image 2 above, and does not require that consumers acknowledge or otherwise engage with the policy to proceed. Following their enrollment in Hims' subscriptions, Hims typically does not provide consumers with notifications regarding upcoming refill dates, such that consumers remain unaware of Hims' refill processing policy before incurring refill charges.

43. Hims' policy thus increases the likelihood that consumers who wish to cancel their subscription or avoid their next refill charge will miss their deadline and be stuck with another month's worth (or multiple months' worth) of unwanted prescription medication. Numerous consumers have complained that they were not made aware of Hims' refill processing policy and consequently faced unwanted charges. After Hims charged these consumers for unwanted refills, Hims' policies prevented consumers from obtaining a refund when they complained about the inadequately disclosed refill charge dates Hims imposes.

## III. <u>Hims Does Not Provide Simple Mechanisms for Consumers to Cancel Their Subscriptions</u>

44. From at least 2019 through early 2025, Hims also imposed a variety of technological hurdles—beyond the inadequately disclosed refill dates—that made it difficult for consumers to cancel their subscriptions in a timely fashion and avoid unwanted charges. Prior to April 2023, Hims required most consumers to contact customer service to cancel their subscription. Starting in April 2023, most consumers could cancel online without the assistance of customer service

(hereinafter, the "Online Cancellation Flow").[2] However, even the Online Cancellation Flow was not a simple mechanism for consumers to cancel their recurring charges.

### A. Pre-April 2023: Hims Requires Most Consumers to Contact Customer Service to Cancel

45. When Hims required most consumers to contact customer service to cancel, customer service agents could, ostensibly, be contacted by phone, email, or an online chat feature. However, as detailed below, none of these methods provided a simple means of cancellation.

46. Across all three communication methods, Hims' policies required that customers first provide their date of birth as well as one of their past order numbers before anyone from customer service would assist them. These policies applied equally in all cases, including when the communication was not live, such as via email. Only after this information was provided would customer service agents engage with the consumer's request to cancel.

47. Hims' customer service operations were also not designed to support the large volume of cancellation requests that consumers made. Due to insufficient staffing levels, Hims' customer service agents regularly missed consumers' inquiries, whether by phone, email, or online chat, and thus failed to address consumers' requests to cancel. For example, customer service agents who handled incoming calls missed hundreds of calls from consumers each week and regularly placed consumers on long holds before answering their calls. Even when Hims' customer service agents did notice consumers' requests to cancel, it frequently took them multiple days, and sometimes as long as a full week, to merely respond to the request.

48. In many instances, Hims also delayed consumers' cancellation requests by imposing additional steps for consumers to go through before their requests to cancel their subscription were honored. For example, when Hims' consumers requested to cancel their subscriptions over email or chat, Hims did not always cancel those subscriptions immediately but would send consumers a link

---

[2] Prior to July 2022, due to California law, only California consumers had a cancellation option that allowed them to cancel online without contacting customer service. Starting in July 2022, consumers in 7 states were given the Online Cancellation Flow, and consumers in California and Colorado were given a simple cancellation option due to new laws passed in those states. By April 2023, consumers in all states (except for those in California and Colorado) had the Online Cancellation Flow.

that purportedly would allow them to cancel the subscription after clicking through a series of questions. However, even if consumers received and attempted to use Hims' cancellation links, in numerous instances, these links would not work. Similarly, some consumers attempting to cancel over the phone would have to wait to receive an email with a link for them to use to cancel online. In addition, Hims' internal policies advised its agents to delay cancellation requests by inquiring about consumers' reasons for cancelling instead of immediately honoring their requests.

49. Hims also made phone cancellations difficult by making its phone number difficult for consumers to find online. For example, starting around late 2022, Hims began removing its phone number from all instances where the phone number was listed in its FAQs, including the FAQ page instructing consumers how to cancel their subscription.

### B. Post-April 2023: Hims Moves to a Confusing & Difficult-to-Use Online Cancellation Flow

50. In April 2023, Hims added the Online Cancellation Flow to its websites (but not its mobile applications) for almost all consumers. But Hims had designed this flow to be anything but a simple cancellation mechanism, making it difficult for consumers to find the option to cancel their subscription and to successfully cancel.

51. As shown below in Image 3, a consumer seeking to cancel their subscription using the Online Cancellation Flow first had to navigate to their subscription page. Once there, they had to click the button next to their subscription that said "Add/remove items from order." Notably, Hims did not use the word "cancel" anywhere on the subscription page and required consumers to guess that the "Add/remove items from order" button would lead to a cancellation option.




**Image 3 – Online Cancellation Flow Screen for Hims Hair Loss**

52. After clicking the "Add/remove items from order" button, the consumer was then taken to a page that again told the user that they were simply adding or removing items from future refill shipments. Notably, this page, which is shown below in Image 4, told the consumer that "Any changes will apply to your subscription going forward," suggesting that the consumer was simply modifying their subscription. Once again, the word "cancellation" did not appear anywhere on this page, requiring the consumer to again guess that unchecking boxes next to their treatment items might unlock a cancellation feature.




**Image 4 – Online Cancellation Flow Screen for Hims Hair Loss**

53. Assuming the consumer correctly guessed that unchecking all of the items in their subscription would unlock a cancellation option, they would then be shown a subsequent page that, for the first time, revealed the option to cancel the consumer's subscription. This is shown below in Image 5.




**Image 5 – Online Cancellation Flow Screen for Hims Hair Loss**

54. Even after clicking the "cancel subscription" button, the consumer's subscription would not be cancelled. Instead, the consumer would then have to click through approximately three to ten survey questions—each its own page or screen—and reaffirm that they wished to cancel before Hims accepted their cancellation request. These survey questions varied across treatment types and included inquiries such as "Have you experienced side effects?", "Is treatment too expensive for you?", or whether the consumer was interested in a retention offer.

55. Because of its internal consumer testing, Hims knew that the Online Cancellation Flow was not a simple cancellation mechanism. Hims tested multiple cancellation mechanisms when it offered online cancellation exclusively to California consumers during the 2019 to mid-2022 period. During this time, Hims tested and adjusted the online flow it used in California to reduce cancellations. For example, in 2020, Hims reported in an internal research document that it had made changes to the California flow in February of that year which led to a dramatic 18% reduction in cancellations, as compared to earlier versions of this flow offered to California

consumers starting in 2019. In June 2022, Hims implemented simple, single-click cancel buttons in California and Colorado. However, when it chose which online cancellation flow to implement in a handful of other states (in July 2022) and then the remaining states (in 2023), Hims chose to use the prior version of the California flow that it had refined to successfully obstruct cancellations.

56. After the Online Cancellation Flow was launched to almost all consumers in April 2023, Hims was again made aware that consumers struggled to find and successfully cancel using the flow. For instance, around July 2023, Hims analyzed its customer support chat logs to assess the effectiveness of the Online Cancellation Flow. Instead of finding a reduction in customer chats regarding cancellation, the analysis found that July customer chats were "dominated by customers seeking to cancel their subscriptions," which in turn "rais[ed] questions, as to why, despite self-help resources, customers still turn to live chat." According to this data, 40% of contacts via live chat still pertained to cancellation inquiries, and in those inquiries pertaining to cancellation, many consumers expressly mentioned not being able to locate any online "cancel subscription" option.

57. Later, in September 2023, two customer service agents suggested to the heads of Hims' customer service department that the Online Cancellation Flow needed to be changed:

> The #1 chat reason is users trying to cancel and unable to do so on their own. The "add or remove" items CTA [Call to Action] is the user's path to cancel, but it's a bit of a dark pattern and unclear that this is how to cancel. It's not until the user clicks this and unchecks their product before they can enter the cancel flow. This will be a delicate test, but if we can make it more clear for users how to cancel and we keep cancel rates level while reducing CX contact rates, this could be a big win (for our business and also reputation).

58. Consumers using Hims' mobile applications faced an equally bad or worse experience than website users when attempting to cancel online. Initially, Hims did not permit users to cancel through the mobile apps for the Hims Platforms. Hims briefly introduced a self-serve in-app cancellation feature in or around May 2023, but then removed it due to a spike in cancellation rates. Hims executives discussed over email whether the increase in customer satisfaction due to an easier cancellation experience on the mobile apps was worth losing out on a million dollars in subscription revenue every quarter. As part of this discussion, Hims' CEO and founder suggested to Hims' executives and employees that Hims should decline to educate

consumers about any future in-app self-serve cancellation launch, so as to mitigate the increased cancellations that would likely result from consumer awareness of that option.

59. Ultimately, Hims decided to delay the launch of any self-serve cancellation option on Hims' mobile apps to January 2024 due to concerns about lost revenues. When launched, the mobile app cancellation flow in most states mirrored the Online Cancellation Flow and thus was similarly unclear and confusing to—and decidedly not simple for—consumers.

## IV. Hims' Deceptive Privacy Practices

60. In connection with the promotion and sale of Hims' services, Hims has also disseminated, or caused to be disseminated, false or misleading privacy assurances regarding the sensitive health information that consumers entrust to Hims. Consumers who enroll and seek treatment on the Hims Platforms have relied on these representations and have been misled as to the sharing of their health information.

### A. Hims Has Misled Consumers About Its Sharing of Their Health Information with Advertising Platforms like Meta and Snap

61. From the outset, Hims has made prominent express or implied representations to consumers regarding the privacy of its service—specifically, that Hims would not disclose consumers' health information to third parties. These representations have been widespread in advertising for the Hims Platforms, where consumers seek treatment for what are typically very private medical conditions such as mental health, erectile dysfunction, and premature ejaculation.

62. For example, until at least late August 2023, a question on the Hims website homepage asked, "How does Hims ensure patient privacy?" In its response, Hims assured consumers that their "medical records and sensitive information are only accessed by the medical providers managing your care." This claim conveyed to consumers that, outside of the consumer's medical provider, Hims would not disclose their health information to third parties.

63. In Hims' online advertisements, Hims prominently advertised that it affords consumers a "100% online, private, and secure process." This claim also conveyed to consumers that Hims would not disclose their health information to third parties.

64. Hims also publishes numerous advertisements by way of "influencers" – social media personalities. Since at least 2019, Hims has solicited and paid influencers to promote Hims' products and services. Hims reviewed, edited, and ultimately had final approval over the advertisements published by influencers on their social media pages. Some influencers expressly describe Hims' services as "discreet," as portrayed in Images 6 and 7. This claim also conveyed to consumers that Hims would not disclose their health information to third parties.




**Image 6 – Influencer Post from April 2021 Advertising Hims**




**Image 7 – Influencer Post from September 2023 Advertising Hims**

65. Lastly, Hims has engaged in extensive offline advertising, such as on TV, on the radio, or on podcasts. Hims' offline advertisements have contained similar representations about the privacy of the Hims Platforms, including describing these platforms as "totally private" or stating that Hims treats medical conditions "privately." This claim similarly conveyed that Hims would not disclose consumers' health information to third parties.

66. Despite promising privacy and discretion, Hims shared consumers' sensitive health information with third-party advertising companies and platforms ("Advertising Platforms") such as Meta Platforms, Inc. ("Meta") and Snap Inc. ("Snap") through at least May 2024. During this time period, Hims did not clearly and conspicuously disclose to consumers that it would share their health information with Advertising Platforms.

### B. Hims Has Shared Consumers' Health Information with Advertising Platforms by Sharing Its Customer Lists and Using Pixel Tracking

67. Contrary to its privacy representations, Hims shared its consumers' health information with Advertising Platforms by sharing certain "Events"—the actions of website visitors on Hims' website—with those Platforms. Hims shared those Events with Meta in two ways, both of which disclosed consumers' health information to Meta.

68. First, Hims compiled lists of the email addresses of consumers who either created accounts to seek specific medical treatment (called a "Complete Registration" Event by Hims) or submitted medical Intake Flows to Hims for review (called a "Purchase" Event by Hims). Hims then uploaded the lists to Meta's advertising platform to match Hims consumers with their profiles on Facebook and Instagram. Hims shared these customer lists with Meta to create two types of advertising audiences: (1) "Customer List Custom Audiences," which allowed Hims to optimize its advertising campaigns on Meta's platforms by narrowing the audiences for its campaigns based on customer list information; and (2) "Lookalike Audiences," which allowed Hims to use its customers' information to target Hims' advertising to other Meta users who were similar demographically to the customers in Hims' customer lists.

69. Despite promising to keep consumers' health information private, Hims shared lists of consumers' email addresses combined with information about the medical treatment sought by those consumers. Between September 2020 and June 2023, Hims uploaded approximately 14 million consumer email addresses to Meta to create "Customer List Custom Audiences." Meta then matched approximately 10 million of these email addresses with a corresponding Meta user ID. In addition, between March 2020 and September 2023, Hims further uploaded consumer email addresses to create 90 "Lookalike Audiences" for Meta advertisements. Hims gave both the Lookalike and Custom Audiences names which purported to reflect the Complete Registrations and Purchases of the Hims customers who were contained in each source list for each audience, thereby revealing to Meta the specific medical treatments that Hims said those customers were interested in and were attempting to purchase. Specifically:

- Hims created audiences such as “All Time Hims ED Purchasers” and “Churned_ED_Customers.” Though some of these audience names used codewords such as “Apollo,” “Atlas,” and “Zeus” (e.g., “All-Time Zeus Purchasers” or “Hers Apollo Signups”) for Hims’ treatments, this was not effective at concealing consumers’ health information because Hims told Meta what these codewords meant. Internal Meta marketing communications demonstrated that Meta knew what Hims’ codewords meant by including the corresponding medical conditions in parentheses as follows: “Apollo (MH),” “Atlas (PEJ),” and “Zeus (ED).” “MH” is an abbreviation for mental health, “PEJ” is an abbreviation for premature ejaculation, and “ED” is an abbreviation for erectile dysfunction. All of these are conditions for which Hims offers medical treatment, including prescription medications prescribed by medical practitioners. Moreover, since Hims only offered treatment for a handful of specific conditions throughout this period, the meaning of the abbreviated terms was easily discerned.
- Hims also labeled its Meta Lookalike Audiences, which were tied to underlying customer lists in a way that described the category-specific Complete Registrations and Purchases of consumers used to generate the lists. In other words, Hims chose names for its Lookalike Audiences that conveyed to Meta which individual consumers created accounts to seek specific medical treatments or submitted Intake Flows to purchase specific medical treatments—thereby disclosing these consumers’ health information to Meta, contrary to promises to keep that information private. These include names for these audiences such as “Lookalike (US, 6% to 7%) – PE Purchasers w LTV” – which created a Lookalike Audience based on a list of consumers whom Hims reported had expressed an interest in purchasing premature ejaculation treatment on the Hims Platform.

70. Second, Hims shared consumers’ health information by way of two automated tracking technologies offered by Meta, specifically the Meta Pixel and Conversions API business tools, which Hims placed on the Hims Platforms to track consumers. The Meta Pixel (formerly the Facebook Pixel) is a piece of code that advertisers working with Meta or purchasing advertising

through Meta can embed in their websites, which allows Meta to collect and track Events on Hims' website. The Conversions API is another Meta tracking tool that serves the same purpose of allowing Meta to automatically track Events but operates differently to the extent it creates a direct connection between the advertiser's server, website, app or other internal software and Meta's systems. These two tools automatically tracked and disclosed certain Events to Meta.

71. In particular, Hims shared consumers' health information in connection with the Complete Registration and Purchase Events. Hims shared these two Events with Meta via these tools approximately 8 million times. Though the Events were titled with standard event names used by Meta, the "parameters" (the data shared with Meta in each Event) included consumers' identifiers, such as email addresses, which Meta used to match consumers to Meta profiles, combined with other data reflecting their interests in specific medical treatments, so as to reveal their sensitive health information. Specifically:

72. *Complete Registration:* The standard and custom Complete Registration Event that Hims shared with Meta included, as parameters, (1) consumers' identifiers, such as their email and IP addresses, combined with (2) information about the specific medical treatment Hims said they were seeking. The Complete Registration Event often contained a custom Hims parameter that identified the treatment type sought according to Hims using the same code names described above, which Meta understood corresponded to specific health conditions (e.g., "Apollo" to mean mental health).

73. *Purchase:* The Purchase Event triggered whenever a consumer submitted an Intake Flow, which typically resulted in a completed purchase. Hims construed submission of the Intake Flow as an agreement to purchase a prescription and to subscribe. Accordingly, Hims routinely charged consumers who triggered the Purchase Event for a prescription, unless the provider declined to write one. The standard and custom Purchase Event that Hims shared with Meta included, as parameters, (1) the consumer's identifiers, such as their email and IP addresses, combined with (2) information about the specific medical treatment Hims said the consumer was attempting to purchase by submitting an Intake Flow. For example, the Purchase Event contained two custom Hims parameters, "product_bucket" and "product_type," in which Hims used

codewords to segregate purchases based on product type (e.g., "M-R" meant "mental health"). Even though Hims had promised consumers that their health information would remain private, internal Meta emails make clear that Meta understood the meaning of these codewords and used consumers' health information as part of its advertising services.

74. As with the customer lists, the Event data Hims shared with Meta allowed Meta to learn about what Hims said were the medical treatment interests of Meta users. Indeed, using the data shared about consumers' Complete Registration and Purchase Events, Hims and Meta were able to group Meta users into specific audiences for Hims' advertisements based on their described interest. For example, using the Event data, Hims created audiences of Meta users such as "Hers – Complete Registration – MH – 30d," "Complete Registration - /ed – 14d," "Hims – Complete Registration – Apollo – 30d" and "New All ED Purchasers (90d)". Hims was only able to create audiences with such specificity because it flouted the promises it made to its users about treating their medical conditions "privately" or keeping their health information private.

75. In addition to advertising with Meta, Hims worked with other Advertising Platforms and shared consumers' health information with these platforms as well.

76. For example, Hims shared consumers' health information with Snap, contrary to Hims' privacy promises. Just as with Meta, Hims uploaded lists of hundreds of thousands of user email addresses to Snap to match these users to their Snapchat accounts. These customer lists also contained information about the Complete Registrations and Purchases of the Users within each source list such as: "All_Time_Hers_Psych_Signups," "AllTime_Hers_MH_SignUps_06092022," "AllTime_Rx+OTC_PEJ_Oct05 2022," "AllTime_RX_PEJ_06082022," and "AllTime_Hims_SexualHealthProduct_Rx+OTC_Oct052022." The above five uploaded lists collectively contained over 1 million email addresses from consumers—effectively disclosing their health information about mental health (Psych_Signups and MH_SignUps), premature ejaculation (Rx+OTC_PEJ and RX_PEJ), and other sexual health products (SexualHealthProduct_Rx+OTC) to Snap, notwithstanding Hims' privacy promises.

77. In addition to Meta and Snap, Hims placed pixels from at least the following Advertising Platforms on its website: Microsoft (Bing Pixel and Bing Image Pixel); Google

(Google Ads Pixel and Google Ads S2S Pixel); Criteo (Criteo Pixel); MediaBids.com (MediaBids Pixel); PartnerCentric (PartnerCentric Pixel); PebblePost.com (PebblePost Pixel); Pinterest (Pinterest Pixel); Podsights (now known as Spotify Ad Analytics - Podsights_iHeartMedia Pixel); Reddit (Reddit Pixel); StackAdapt (StackAdapt Pixel); TikTok (TikTok s2s Pixel); the Trade Desk (Trade Desk Pixel); and X (formerly known as Twitter - Twitter Pixel). As with the Meta and Snap pixels, many of these pixels captured and shared Users' health information by way of similar pixel tracking events that captured Hims Users' Complete Registrations and Purchases—all of which was contrary to Hims' privacy promises.

78. At all relevant times in which Hims engaged and has continued to engage in the business practices described above, Hims has had significant experience with negative-option marketing and has been aware of the laws that apply to this form of marketing, such as the FTC Act and ROSCA. Hims has extensive legal resources, including in-house and outside counsel with expertise in the FTC Act and ROSCA. Hims has acknowledged in public filings with the Securities and Exchange Commission since as early as 2021 that: (a) its business model and services could be negatively impacted by "regulatory developments that affect [its] business, including in healthcare, data privacy and security, and consumer protection"; and (b) it could be subject to claims by governmental entities due to perceived failure to comply with "federal, state, or local laws or regulations governing [Hims'] marketing activities." In addition, throughout the period in which Hims has charged consumers for negative option prescription subscriptions, the U.S. Department of Justice and the FTC have litigated or settled actions against other companies under the FTC Act and ROSCA, including for not disclosing material terms prior to collecting billing information, charging consumers without authorization, and failing to have simple cancellation mechanisms. Hims has also been aware since at least late 2023 of FTC scrutiny into Hims' subscription enrollment and cancellation practices, including a Civil Investigative Demand issued to Hims in October 2023 seeking documents and information pertaining to, among other things, potential violations of the FTC Act and ROSCA.

79. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Hims is violating or about to violate the laws enforced by the Commission because, among other things:

- Hims failed to immediately stop the unlawful conduct alleged herein when they learned of consumers' complaints about the unlawful conduct;
- Hims failed to immediately stop the unlawful conduct alleged herein when they learned of the FTC's investigation;
- Hims earned significant revenues from participating in the unlawful conduct alleged herein; and
- To the extent Hims has changed or stopped any unlawful conduct, they did so only after learning of the FTC's investigation.

## VIOLATIONS OF THE FTC ACT

80. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

81. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### FTC Act Section 5 – Deceptive Privacy Practices

### (by Plaintiff FTC)

82. As alleged in paragraphs 60-77, in numerous instances, in connection with the advertising, marketing, promotion, or offering for sale of Hims' services offering online medical treatment and medical products, including prescription medications, Hims has represented, directly or indirectly, expressly or by implication that:

A. Sensitive health information provided by Users to Hims is only accessed by medical providers providing care;

B. Hims' services are private; and

C. Hims' services are discreet.

83. In fact:

A. Sensitive health information provided by Users to Hims has been shared with third-party Advertising Platforms;

B. Hims' services have not been private; and

C. Hims' services have not been discreet.

84. Each of the above-listed representations in Paragraph 82 are material to consumers.

85. Therefore, Hims' representations constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**

**FTC Act Section 5 – Failure to Disclose Hims' Practice of Sharing Health Information with Advertising Platforms**

**(by Plaintiff FTC)**

86. As alleged in paragraphs 60-77, in numerous instances, in connection with the advertising, marketing, promotion, or offering for sale of Hims' services offering online medical treatment and medical products, including prescription medications, Hims has represented, directly or indirectly, expressly or by implication that:

A. Sensitive health information provided by Users to Hims is only accessed by medical providers providing care;

B. Hims' services are private; and

C. Hims' services are discreet.

87. In numerous instances when Hims has made the representations described in Paragraph 86, Hims has failed to disclose or failed to adequately disclose that Hims shared sensitive health information provided by consumers with third-party Advertising Platforms. This fact would have been material to consumers in deciding whether to enroll in the Hims Platforms.

88. In light of the representations described in Paragraph 86, Hims' failure to disclose the material information described in Paragraph 87 constituted a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

**FTC Act Section 5 – Deceptive Intake Practices**

**(by Plaintiff FTC)**

89. As alleged in paragraphs 16-40, in numerous instances, in connection with the advertising, marketing, promotion, or offering for sale of Hims' services offering online medical treatment and medical products, including prescription medications, Hims has represented, directly or indirectly, expressly or by implication, that:

A. A consumer submitting an Intake Flow for review by a medical provider will be able to have a dialogue with the provider about the provider's treatment recommendation;

B. A consumer submitting an Intake Flow for review by a medical provider is not agreeing to pay any money for, or to subscribe to, the recommended treatment at the time they submit that Intake Flow for review; and

C. A consumer submitting an Intake Flow for review by a medical provider will only be charged and subscribed after they confirm their consent to the provider's treatment recommendation.

90. In fact, in numerous instances in which Hims has made the representations described in Paragraph 89:

A. A consumer submitting an Intake Flow for review by a medical provider is not able to have a dialogue with the provider about the provider's treatment recommendation;

B. A consumer submitting an Intake Flow for review by a medical provider is agreeing to pay money and to be subscribed as soon as their prescription is written, without an opportunity to avoid the charges; and

C. A consumer submitting an Intake Flow for review by a medical provider does not have an opportunity to confirm their consent to the provider's treatment recommendation before being charged or subscribed.

91. Therefore, Hims' representations constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

92. The Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, became effective on December 29, 2010. Congress passed ROSCA recognizing that "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." ROSCA § 2, 15 U.S.C. § 8401.

93. ROSCA prohibits certain unfair or deceptive internet sales practices with a "negative option feature," which is defined in the FTC's Telemarketing Sales Rule ("TSR") as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

94. As described above, Hims has promoted and sold services offering medical treatment and medical products, including prescription medications, through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

95. ROSCA generally prohibits charging consumers for a good or service sold in a transaction effected on the Internet through a negative option feature, unless the seller, among other things: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent before making the charge; and (3) provides simple mechanisms to stop recurring charges. ROSCA § 4, 15 U.S.C. § 8403.

96. Pursuant to Section 5(a) of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT IV**

**ROSCA - Failure to Clearly and Conspicuously Disclose Material Terms**

**(by Plaintiff FTC)**

97. As alleged in paragraphs 16-77, in numerous instances, in connection with charging or attempting to charge consumers for medical treatment and medical products sold in transactions effected on the Internet through a negative option feature, Hims has failed to: (a) timely disclose material terms of the transaction, clearly and conspicuously, before obtaining the consumer's billing information; and (b) clearly and conspicuously disclose material terms of the transaction including, for example, the timing of the charge for consumers' first order, when consumers will be subscribed to the treatment plan, the dates by which consumers will receive charges for refill shipments, and Hims' practices of sharing consumers' sensitive health information with Advertising Platforms.

98. Hims' acts or practices described above violate Section 4 of ROSCA, 15 U.S.C. § 8403, and are thus treated under Section 5 of ROSCA, 15 U.S.C. § 8404(a), as violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT V**

**ROSCA - Failure to Obtain Express Informed Consent**

**(by Plaintiff FTC)**

99. As alleged in paragraphs 16-77, in numerous instances, in connection with charging or attempting to charge consumers for medical treatment and medical products sold in transactions effected on the Internet through a negative option feature, Hims has failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

100. Hims' acts or practices described above violate Section 4 of ROSCA, 15 U.S.C. § 8403, and are thus treated under Section 5 of ROSCA, 15 U.S.C. § 8404(a), as violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT VI**

**ROSCA - Failure to Provide Simple Cancellation Mechanisms**

**(by Plaintiff FTC)**

101. As alleged in paragraphs 44-59, in numerous instances, in connection with charging or attempting to charge consumers for medical treatment and medical products sold in transactions effected on the Internet through a negative option feature, Hims has failed to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

102. Hims' acts or practices described above violate Section 4 of ROSCA, 15 U.S.C. § 8403, and are thus treated under Section 5 of ROSCA, 15 U.S.C. § 8404(a), as violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT VII**

**Violations of California's FAL, Cal. Business and Professions Code § 17500 *et seq*.**

**(by Plaintiff People of the State of California)**

103. The People of the State of California re-allege and incorporate herein paragraphs 4 through 7, 12, and 14 through 102 of this Complaint.

104. Hims has engaged in business acts or practices as alleged in this Complaint that constitute violations of Business and Professions Code section 17500 *et seq.* by making or disseminating, or causing to be made or disseminated, false or misleading statements with the intent to induce members of the public to use its website or applications when Defendant knew, or by the exercise of reasonable care should have known, that the statements were false or misleading.

105. Defendant's false or misleading statements include, but are not limited to, the following statements, promises, omissions, and representations that:

A. A consumer would have the opportunity to consult with a medical provider regarding their treatment recommendation when, in fact, many consumers were already charged for and enrolled in a subscription before they even

learned what treatment the provider had recommended and were never able to consult with a provider;

B. A consumer submitting an Intake Flow for review by a medical provider was not agreeing to pay any money for, or to subscribe to, the recommended treatment at the time they submitted the Intake Flow for review when, in fact, Hims charged consumers and considered them to have agreed to subscriptions for recommended treatment just because they had completed the Intake Flow;

C. A consumer submitting to Hims an Intake Flow for review by a medical provider would only be charged and subscribed after they confirmed their consent to the provider's treatment recommendation when, in fact, most consumers were not given a real opportunity to confirm and consent to the recommended treatments before they were charged; and

D. A consumer who provided information, including health information, to Hims would have that information kept private, that Hims would be discreet with information consumers provided to it, and that Hims would not disclose consumers' health information to third parties when, in fact, it shared consumers' sensitive health information with third-party Advertising Platforms without their consent through at least May 2024.

106. Each of these misrepresentations and/or omissions described in paragraph 105 was material and likely to deceive a reasonable consumer or prospective customer.

107. The People seek an injunction requiring Hims to cease the false and misleading advertising practices alleged herein pursuant to Business and Professions Code section 17535.

108. The People further seek an appropriate civil penalty under Business and Professions Code section 17536 of up to two thousand five hundred dollars ($2,500) for each violation of Business and Professions Code section 17500.

109. The People seek all other relief available under California law, including restitution and such other equitable relief as the Court deems just and proper.

**COUNT VIII**

**Violations of California's UCL, Cal. Business and Professions Code § 17200 *et seq*.**

**(by Plaintiff People of the State of California)**

110. The People of the State of California re-allege and incorporate herein paragraphs 4 through 7, 12, and 14 through 109 of this Complaint.

111. Defendant is a "person" as defined by Business and Professions Code section 17201, which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."

112. Hims' acts or practices alleged in the Complaint violate California's UCL, Business and Professions Code § 17200, which prohibits any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200.

113. Defendant's violations of the UCL include, but are not limited to:

114. Violations of the False Advertising Law, California Business and Professions Code § 17500, as more fully set forth in Count VII above;

115. Violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged above in paragraphs 4 through 7 and 16 through 91;

116. Violations of Section 4 of the ROSCA, 15 U.S.C. § 8403, as alleged above in paragraphs 4 through 7, 16 through 77, and 92 through 102;

117. Violations of California's Automatic Renewal Law, California Business and Professions Code § 17600 *et seq.*:

A. "'Automatic renewal' means a plan, arrangement, or provision of a contract that contains a free-to-pay conversion or in which a paid subscription or purchasing agreement is automatically renewed at the end of the definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a)(1).

B. "'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the

same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(a)(3).

C. "'Continuous Service' means a plan, arrangement, or provision of a contract that contains a free-to-pay conversion or in which a paid subscription or purchasing agreement continues until the consumer cancels the service." Bus. & Prof. Code § 17601(a)(5).

D. California Business and Professions Code section 17602(a)(1) provides, in pertinent part, that it is unlawful "for any business that makes an automatic renewal offer or continuous service offer to a consumer in [California] to . . . [f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer." Hims has, in numerous instances, violated this section because, as alleged above in paragraphs 16-77, it: (a) failed to clearly disclose to consumers that, upon submitting their Intake Flow, they were agreeing in advance to a binding charge and automatic subscription enrollment as soon as a provider recommended a treatment on the Hims Platform; (b) failed to conspicuously disclose the terms of the offer because its disclosures were, for example, in small low-contrast font or were *below* the final call-to-action button that a consumer had to press to submit their Intake Flow for review; and (c) failed to clearly disclose the terms of the offer because Hims used language which created ambiguity as to if and when enrollment in an automatic renewal contract would occur.

E. Section 17602(a)(2) provides, in pertinent part, that it is unlawful "for any business that makes an automatic renewal offer or continuous service offer to a consumer in [California] to . . . [c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent

to the agreement containing the automatic renewal offer terms or continuous service offer terms." Hims has, in numerous instances, violated this section because, as alleged above in paragraphs 16-77, it: (a) failed to clarify for California consumers when they would be subscribed to Hims' automatic renewal service or charged for it - consumers cannot be said to have given express affirmative consent to enter an agreement when Hims failed to inform them that they were actually entering that agreement; and (b) failed to disclose material terms of the automatic renewal agreement prior to charging consumers such that consumers cannot be said to have given affirmative consent to those terms.

F. Section 17602(a)(4) provides, in pertinent part, that it is unlawful "for any business that makes an automatic renewal offer or continuous service offer to a consumer in [California] to . . . [f]ail to obtain the consumer's express affirmative consent to the automatic renewal or continuous service offer terms." Hims has, in numerous instances, violated this section because, as alleged above in paragraphs 16-77, it: (a) failed to clarify for most California consumers when they would be subscribed to Hims' automatic renewal or continuous service - consumers cannot be said to have given express affirmative consent to enter into an agreement when Hims failed to inform them that they were actually entering that agreement; and (b) failed to disclose material terms of the automatic renewal or continuous service prior to charging consumers such that consumers cannot be said to have given affirmative consent.

G. Section 17602(a)(7) provides, in pertinent part, that it is unlawful "for any business that makes an automatic renewal offer or continuous service offer to a consumer in [California] to . . . [m]isrepresent, expressly or by implication, any material fact related to the transaction, including, but not limited to, the inclusion of an automatic renewal or continuous service, or any material fact

related to the underlying good or service." Hims violated this section because, as alleged in paragraphs 16-77, in numerous instances, Hims failed to accurately represent and disclose materials terms of the automatic renewal agreement to consumers, including, for example, the timing of the charge for consumers' respective first orders, when consumers would be subscribed to the treatment plan, the dates by which consumers would receive charges for refill shipments.

118. Violations of the California common law invasion of privacy laws and the right to privacy under the California Constitution, Article 1, section 1. These violations occurred based on Defendant's secret disclosure of consumers' health information which constitutes an intentional intrusion upon consumers' private matters that were intended to stay private from third parties that consumers did not consent to, authorize, or have any reason to know about such intrusions at the time they occurred; and such intrusions would be highly offensive to a reasonable person. Additionally, Consumers did not consent to or authorize Defendant to disclose their health information to unauthorized third parties; the disclosure of their information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms; and Defendant's conduct would be highly offensive to a reasonable person because the information disclosed was highly sensitive and personal, was protected by the California Constitution, and Defendant lacked consent or authorization to disclose such information;

119. Defendant's unfair and fraudulent practice under which it represented that consumers would have the opportunity to consult with a medical provider regarding their treatment recommendation when, in fact, most consumers have already been charged for and enrolled in a subscription before they even learn what treatment the provider has recommended;

120. Defendant's unfair and fraudulent practice under which it represented that it would not disclose consumers' health information to third parties when, in fact, it shared consumers' sensitive health information with third-party Advertising Platforms through at least May 2024;

121. Defendant's unfair and fraudulent practice under which it failed to obtain consumers' express informed consent before charging them and subscribing them;

122. Defendant's unfair and fraudulent practice under which it failed to obtain consumers' express informed consent before charging them for refills on their prescriptions; and

123. Defendant's unfair and fraudulent practice under which it failed to provide a simple mechanism for consumers to cancel their prescriptions.

124. Section 17203 of the UCL provides that "(a)ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. Section 17203 also permits recovery of any "money or property, real or personal" acquired by a violation of the UCL. *Id.*

125. Under the UCL's Section 17205, these remedies and penalties are "cumulative to each other and to the remedies or penalties available under all other laws of this state." Cal. Bus. & Prof. Code § 17205.

126. Section 17206, subdivision (a), of the UCL provides that any person violating Section 17200 "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the [P]eople of the State of California … by a county counsel of any county within which a city has a population in excess of 750,000 … in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17206. Section 17206(a) thereby authorizes the County Counsel of Los Angeles County, where the City of Los Angeles, located in Los Angeles County, has a population in excess of 750,000, to bring such an action.

127. The People of the State of California, therefore, are entitled to: an injunctive order requiring Defendant to permanently cease the unlawful, unfair, and fraudulent acts or practices alleged herein, including Defendant's false and misleading advertising; restitution to all victims of such acts or practices; civil penalties; and other remedies under the law.

## VIOLATIONS OF THE UTAH CSPA

128. Section 4(1) of the Utah CSPA, Utah Code § 13-11-4(1), prohibits suppliers from engaging in "deceptive act[s] or practice[s] in connection with a consumer transaction . . . whether the deceptive act occurs before, during, or after the transaction."

129. Under the Utah CSPA, a "supplier" includes "a seller, . . . offeror, . . . or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not the person deals directly with the consumer." *Id.* § 13-11-3(5).

130. The Utah CSPA defines a "consumer transaction" to include "a sale . . . or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible . . . to, or apparently to, a person for . . . primarily personal, family, or household purposes." *Id.* § 13-11-3(2)(a).

131. As described in this Complaint, Hims offers and sells medical treatment services and medical products, including prescription medications, to consumers for their personal use in the State of Utah.

## <u>COUNT IX</u>

### Deceptive Acts and Practices, Utah Code § 13-11-1 *et seq.*

### (by Plaintiff Utah Division of Consumer Protection)

132. By engaging in the practices alleged in paragraphs 16–77 of this Complaint, Hims committed deceptive acts and practices, including by making or causing (whether directly or indirectly, explicitly or by implication) misrepresentations or omissions of material fact to Utah consumers in connection with their transactions for Hims treatment subscriptions. These deceptive acts and practices include:

A. Misrepresenting the privacy of Hims' services;

B. Misrepresenting the discretion of Hims' services;

C. Misrepresenting that sensitive health information consumers provide to Hims is only accessed by medical care providers when, in fact, Hims shares consumers' sensitive health information with third-party Advertising Platforms;

D. Failing to disclose, or failing to clearly and conspicuously disclose, that Hims shares consumers' sensitive health information with third-party Advertising Platforms;

E. Failing to provide consumers with a clear and conspicuous opportunity to opt out of having their sensitive health information shared with third-party Advertising Platforms;

F. Misrepresenting that consumers submitting an Intake Flow for review by a medical provider will be able to have a dialogue with the provider about the provider's treatment recommendation when, in fact, most consumers do not have the opportunity for a dialogue with the provider about their treatment recommendation;

G. Misrepresenting that consumers submitting an Intake Flow for review by a medical provider are not agreeing to pay any money for, or subscribe to, the recommended treatment at the time they submit the Intake Flow when, in fact, consumers are agreeing to pay money and be subscribed as soon as their prescription is written, with virtually no opportunity to avoid the charges;

H. Misrepresenting that consumers submitting an Intake Flow for review by a medical provider will only be charged and subscribed after confirming their consent to the provider's treatment recommendation when, in fact, most consumers do not have an opportunity to confirm their consent before being charged and subscribed;

I. Failing to obtain consumers' express informed consent before charging consumers for their treatment subscription;

J. Failing to disclose, or failing to adequately disclose, the timing of the charge for consumers' first order;

K. Failing to disclose, or failing to adequately disclose, the timing for when consumers will receive charges for refill shipments; and

L. Failing to disclose, or failing to adequately disclose, the means by which consumers may cancel their treatment subscription.

133. By engaging in such deceptive acts and practices, Hims has violated the Utah CSPA. Utah Code § 13-11-4.

## CONSUMER INJURY

134. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Hims' violations of the FTC Act, ROSCA, California's Unfair Competition Law, California's False Advertising Law, and the Utah CPSA. Absent injunctive relief by this Court, Hims is likely to continue to injure consumers and harm the public interest.

## CIVIL PENALTIES

135. Defendant violated California Business and Professions Code sections 17200 and 17500. California Business and Professions Code section 17206 authorizes this Court to award civil penalties of up to $2,500 for each violation of section 17200 and California Business and Professions Code section 17536 authorizes this Court to award civil penalties of up to $2,500 for each violation of Business and Professions Code section 17500.

136. Section 17(1)(e) of the Utah CSPA, Utah Code § 13-11-17(1)(e), authorizes this Court to impose civil penalties for violations of the Utah CSPA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, California's Unfair Competition Law, California's False Advertising Law, and the Utah CSPA;

B. Award monetary and other relief within the Court's power to grant pursuant to the FTC Act, ROSCA, California's Unfair Competition Law, California's False Advertising Law, and the Utah CSPA;

C. Order an equitable accounting of Hims' revenue in Utah, including ordering disgorgement of all money or anything of value received in violation of the Utah CSPA;

D. Award Plaintiff States civil penalties, fines, and/or forfeitures for each violation of their respective state laws, including civil penalties pursuant to California Business and Professions Code sections 17206 and 17536 of up to $2,500 per violation of each section and civil penalties pursuant to the Utah CSPA, as well as attorneys' fees and expenses as provided under state law;

E. Award Plaintiffs the cost of bringing this action, attorneys' fees and such other and additional relief as the Court may determine to be just and proper; and

F. Award any additional relief as the Court determines to be just and proper.

Dated: July 29, 2026

Respectfully submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

*/s/ Siobhan C. Amin*
SIOBHAN C. AMIN
BARBARA CHUN
JORDAN NAVARRETTE
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
samin@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**FOR THE PEOPLE OF THE STATE OF CALIFORNIA:**

*/s/ Scott Kuhn*
DAWYN R. HARRISON
County Counsel
SCOTT KUHN
Assistant County Counsel
ANDREA ROSS
Principal County Counsel
PETER S. LEE
Senior Deputy County Counsel
HANNAH FLORES
Deputy County Counsel

CHRISTINA TUSAN
ADRIAN BARNES
TUSAN LAW, P.C.

Attorneys for the PEOPLE OF THE STATE OF CALIFORNIA

**FOR THE UTAH DIVISION OF CONSUMER PROTECTION:**

*/s/ Alexandra Butler*
DEREK E. BROWN
UTAH ATTORNEY GENERAL

Douglas Crapo
Alexandra Butler
Daniel Ruskin
Assistant Attorneys General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0310
crapo@agutah.gov
alexandrabutler@agutah.gov
druskin@agutah.gov

**FILER'S ATTESTATION**

I, Siobhan C. Amin, am the ECF user whose user ID and password authorized the filing of this document. Under Civil Local Rule 5-1(i)(3), I attest that all signatories to this document have concurred in this filing, and that this document was served by electronic filing or email on all counsel of record on August 18, 2026.

Dated: August 18, 2026

*_/s/ Siobhan C. Amin_*
SIOBHAN C. AMIN