KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
MAYA JAMES - # 318554
mjames@keker.com
NIALL M. FRIZZELL - # 311929
nfrizzell@keker.com
EMILY HASSELBERG - # 326990
ehasselberg@keker.com
SARA FITZPATRICK - # 337360
sfitzpatrick@keker.com
633 Battery Street
San Francisco, California 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant
HIMS & HERS HEALTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION; THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through LOS ANGELES COUNTY COUNSEL DAWYN R. HARRISON; and UTAH DIVISION OF CONSUMER PROTECTION,<br><br>Plaintiffs,<br><br>v.<br><br>HIMS & HERS HEALTH, INC.,<br><br>Defendant. | Case No. 3:26-cv-07871-VC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT HIMS & HERS HEALTH, INC.'S MOTION TO DISMISS**<br><br>Date: January 7, 2027<br>Time: 10:00 a.m.<br>Dept.: Courtroom 3 – 17th Floor<br>Judge: Hon. Vince Chhabria<br><br>Date Filed: July 29, 2026<br><br>Trial Date: Not yet set |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................1

II. BACKGROUND ....................2

A. H&H provides telehealth services focused on consumer accessibility....................2

B. The H&H intake process clearly discloses the terms of a transaction made through the H&H platform....................3

C. The H&H Privacy Policy and Terms and Conditions disclose that it may share specified user data with advertising partners....................4

D. H&H provides simple mechanisms to cancel. ....................5

III. LEGAL STANDARD....................5

IV. ARGUMENT....................6

A. The Section 5 claims (Counts I-III) should be dismissed. ....................6

1. Plaintiffs fail to allege deceptive privacy practices (Count I)....................6

2. Plaintiffs fail to allege deception regarding the disclosure of data-sharing with advertisers (Count II). ....................9

3. Plaintiffs fail to allege deceptive intake practices (Count III). ....................9

4. Plaintiffs allege no grounds for relief, foreclosing all Section 5 claims. ....................11

B. The ROSCA claims (Counts IV-VI) should be dismissed....................12

1. Plaintiffs do not allege a negative-option feature, foreclosing all ROSCA claims....................13

2. Plaintiffs fail to allege a claim based on clearly and conspicuously disclosing material terms or lack of informed consent (Counts IV-V). ....................14

3. Plaintiffs fail to allege a claim based on the absence of a simple cancellation mechanism. ....................17

C. The California claims (Counts VII-VIII) should be dismissed....................17

1. Plaintiffs cannot plausibly identify unlawfulness under the UCL. ....................18

2. Plaintiffs fail to allege fraud or unfairness for UCL or FAL purposes. ....................19

D. The Utah claim (Count IX) should be dismissed....................20

E. Plaintiffs lack standing to pursue injunctive relief. ............................................20

V. CONCLUSION.........................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*,
593 U.S. 67 (2021) ..... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 5

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007) ..... 12, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 6, 13

*Bly-Magee v. California*,
236 F.3d 1014 (9th Cir. 2001) ..... 8

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
911 F.2d 242 (9th Cir. 1990) ..... 7

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) ..... 8

*F.T.C. v. AAFE Prods. Corp.*,
2017 WL 3896763 (S.D. Cal. 2017) ..... 14

*F.T.C. v. Bunzai Media Grp., Inc.*,
2015 WL 5305243 (C.D. Cal. Sept. 9, 2015) ..... 14

*F.T.C. v. Dave, Inc.*,
2025 WL 2698698 (C.D. Cal. Sept. 12, 2025) ..... 14, 16

*F.T.C. v. D-Link Sys., Inc.*,
2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ..... 6

*F.T.C. v. Doxo, Inc.*,
771 F. Supp. 3d 1162 (W.D. Wash. 2025) ..... 14

*F.T.C. v. Health Formulas, LLC*,
2015 WL 2130504 (D. Nev. May 6, 2015) ..... 14

*F.T.C. v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) ..... 6, 8

*F.T.C. v. Triangle Media Corp.*,
2018 WL 4051701 (S.D. Cal. Aug. 24, 2018) ....................14

*F.T.C. v. Uber Techs., Inc.*,
830 F. Supp. 3d 912 (N.D. Cal. 2026) ....................14, 15

*F.T.C. v. Univ. Premium Servs., Inc.*,
2007 WL 9728965 (C.D. Cal. Feb. 21, 2007)....................9

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................19

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024)....................9

*Mehta v. Robinhood Fin. LLC*,
2021 WL 6882377 (N.D. Cal. May 6, 2021) ....................7

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ....................7

*NorthBay Healthcare Grp. v. Blue Shield of Cal.*,
342 F. Supp. 3d 980 (N.D. Cal. 2018) ....................19

*Pirozzi v. Apple, Inc.*,
966 F. Supp. 2d 909 (N.D. Cal. 2013) ....................19

*Sanchez v. Nurture, Inc.*,
626 F. Supp. 3d 1107 (N.D. Cal. 2022) ....................19

*Sloan v. Anker Innovations Ltd.*,
711 F. Supp. 3d 946 (N.D. Ill. 2024) ....................7

*Snyder v. G6 Hosp. LLC*,
2025 WL 2426613 (C.D. Cal. Aug. 18, 2025)....................15

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ....................7

*Strubel v. Cap. One Bank, N.A.*,
179 F. Supp. 3d 320 (S.D.N.Y. 2016)....................15

*United States v. Adobe, Inc.*,
791 F. Supp. 3d 966 (N.D. Cal. 2025) ....................14, 16, 17

*United States v. MyLife.com, Inc.*,
499 F. Supp. 3d 757 (C.D. Cal. 2020) ....................13, 14

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................7

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ....................6, 8, 19

*Viggiano v. Hansen Nat. Corp.*,
944 F. Supp. 2d 877 (C.D. Cal. 2013) ....................9

**State Cases**

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ....................18

**Federal Statutes**

15 U.S.C. § 45....................2, 12

15 U.S.C. § 8403.................... *passim*

**State Statutes**

Bus. & Prof. Code § 17601....................18

Bus. & Prof. Code § 17602....................18

Utah Code § 13-11-4....................20

**Regulations**

16 C.F.R. § 310.2(w) ....................13, 14

**Other Authorities**

Consultation, *Black's Law Dictionary* (12th ed. 2024) ....................10

## I. INTRODUCTION

Plaintiffs accuse Hims & Hers Health, Inc. ("H&H") of deceiving consumers by misrepresenting practices that H&H expressly disclosed. They claim H&H secretly shared consumer information with advertisers, but omit H&H's Privacy Policy, which discloses those practices to all consumers. They claim H&H misrepresented its subscription charges and renewal terms, but disregard the clear disclosures reproduced in their own complaint. And Plaintiffs stretch the Restore Online Shoppers Confidence Act ("ROSCA") beyond what Congress intended, treating installment payments under fixed-term contracts as a negative-option feature, and invoking a statute governing negative-option billing to police privacy practices. Plaintiffs cannot manufacture deception by ignoring what H&H told consumers, or create liability by rewriting ROSCA.

**Privacy.** Plaintiffs contend that H&H promised consumers "private" and "discreet" telehealth services but secretly shared their information with advertising platforms. Yet the complaint never mentions H&H's Privacy Policy, which every visitor to the H&H platform is directed to, and which consumers must acknowledge when creating an account. That judicially noticeable Policy expressly discloses that H&H "may provide personal information to marketing and advertising partners," including "sensitive information" concerning activity on the platform. The Policy further discloses tracking by third-party advertisers and provides links to manage privacy settings with advertisers, including Meta and Google. Plaintiffs ignore these explicit disclosures, relying instead on a former website FAQ about a different subject, two unidentified advertisements, and two influencer posts describing H&H's services as "discreet." Dkt. 28 ¶¶ 62-65. An assurance that consumers may obtain treatment discreetly, without an in-person visit, is not a privacy policy, and cannot displace the clear policy consumers see and must acknowledge.

**Billing.** Plaintiffs employ the same selective reading in their claims about H&H's subscription practices. They isolate statements such as "Pay $0 today" and "you won't be charged until prescribed," then insist those statements promise consumers an additional consultation and a second opportunity to authorize payment after a provider approves treatment.

Dkt. 28 ¶¶ 25-30. But the complaint reveals that H&H made no such promise. Plaintiffs' own screenshot of the checkout screen expressly states that "[i]f prescribed medication," the consumer "will be charged $147 for your first 90 days supply and $147 every 90 days thereafter until you cancel." *Id.* ¶ 26. It explains that refills "will be charged and shipped 10 days early," and specifies when and how consumers can cancel. *Id.* By that point, consumers have selected a treatment and refill schedule and provided billing and shipping information. *Id.* ¶¶ 19, 26. These disclosures are far from "vague." They are specific, accurate, and unambiguous. A free medical assessment is not a promise of free medication, and a promise to charge only upon prescription is not a promise to obtain a second authorization after prescription.

**Cancellation.** Plaintiffs' ROSCA claims fail at the threshold because the complaint does not allege a negative-option billing feature, which ROSCA requires. 15 U.S.C. § 8403; Dkt. 28 ¶ 95. Moreover, even if ROSCA applies, the complaint itself demonstrates that H&H disclosed all material terms and offered a "simple" cancellation mechanism. 15 U.S.C. § 8403(3). As the complaint acknowledges, H&H offered cancellation by telephone, email, and chat; made online cancellation available to most consumers beginning in April 2023; and subsequently introduced cancellation through its mobile apps. Dkt. 28 ¶¶ 44-59. That Plaintiffs believe there may be *easier* procedures does not mean that H&H's cancellation mechanisms violated the law.

**Relief.** Finally, Plaintiffs fail to plausibly allege any ongoing or likely future unlawful conduct warranting injunctive relief. *Id.* ¶¶ 31-32, 44, 59. Nor do Plaintiffs allege knowledge of unlawful conduct, as required for civil penalties.

The FTC is entrusted with enforcing a statute prohibiting "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1). Yet Plaintiffs' complaint alleges deception only by ignoring the very disclosures that explain what consumers were told. The complaint should be dismissed.

## II. BACKGROUND

### A. H&H provides telehealth services focused on consumer accessibility.

H&H is a telehealth company that operates a platform connecting consumers with licensed healthcare providers, facilitating access to healthcare and related services. Since

launching in 2017, H&H has expanded from men's health into a platform serving both men and women, offering treatment for hair loss, sexual health, dermatology, mental health, and weight loss. Dkt. 28 ¶¶ 16-17. Through the H&H platform, consumers complete an online medical intake that is reviewed independently by a licensed medical provider who determines whether treatment is appropriate and, if so, what to prescribe. *Id.* ¶¶ 17-19, 24-25. H&H facilitates access to pharmacies that fill and ship medication directly to consumers. *Id.* ¶ 17. The licensed providers practice under state medical licensing and telehealth laws, which govern, among other things, whether a prescription may be written without a real-time consultation, as most states permit. *See id.* ¶ 27 n.1. Within that framework, the H&H platform gives patients a convenient way to obtain clinical treatment, making it easier for millions of consumers to access care for a broad range of health conditions.

### B. The H&H intake process clearly discloses the terms of a transaction made through the H&H platform.

Plaintiffs allege that consumers are "misled" about the terms of treatment and subscriptions. Dkt. 28 ¶¶ 20-40. But the relevant terms are disclosed plainly through the Intake Flow, as Plaintiffs' allegations and materials incorporated by reference confirm.

Consumers access care through the H&H platform in four steps. *Id.* ¶ 18. First, they select the type of treatment they are seeking and answer questions concerning their treatment interests and goals. *Id.* ¶ 19. Next, they create an account, which requires them to expressly acknowledge H&H's operative Terms and Conditions ("T&C") and Privacy Policy. Consumers are presented with the T&C and Privacy Policy in a clear and conspicuous manner, underlined and hyperlinked for easy access and review. Bouzakis Decl., Exs. B-C (Privacy Policy and T&C). After completing an assessment about their medical history, the consumer sees the medical treatments a provider may prescribe (if approved), along with the price and frequency of refill shipments of the prescribed medication. Dkt. 28 ¶ 19. The consumer then selects a preferred treatment option, a specific refill cadence (for example, every 30 or 90 days) and inputs their billing and shipping information. *Id.* ¶¶ 19, 41.

Further, before consumers submit their information, H&H clearly discloses how its intake, renewal, and cancellation process works: "If prescribed medication, you are purchasing an automatically-renewing subscription and will be charged $147 for your first 90 days supply and $147 every 90 days thereafter until you cancel." *Id.* ¶ 26. The next shipment "will be charged and shipped 10 days early to prevent any gaps in your treatment" and "[o]ngoing shipments may be charged earlier to accommodate holidays or other operational reasons to support treatment continuity." *Id.* And the medication will be "automatically refilled" on a "continuous basis," unless canceled at least two days before the next processing date. *Id.* In 2025, H&H updated the post-submission screen to explain even more clearly, "if approved, your prescription is charged to the card you provided and shipped to you directly." *Id.* ¶ 32. After the consumer submits their intake, a medical provider reviews their information, has the option to message the consumer if necessary, and then prescribes medication if appropriate, thereby initiating the requested subscription and completing the consultation.[1] *Id.*

### C. The H&H Privacy Policy and Terms and Conditions disclose that it may share specified user data with advertising partners.

Plaintiffs allege that H&H promised not to disclose health information to anyone but medical providers, based on advertisements promising a "private" and "discreet" process. Dkt. 28 ¶¶ 61-65. Plaintiffs further allege that this promise was false because H&H shared consumer information with third-party advertising platforms. *Id*. ¶ 67. But H&H never made that promise. To the contrary, H&H's Privacy Policy and T&C — which every consumer was required to acknowledge before entering the intake flow — explain that user information, including health information, is collected and may be shared with advertising partners. Bouzakis Decl., Ex. B (Privacy Policy).

The T&C informs consumers that their "personal information, including health information" was "subject to use by us in accordance with our Privacy Policy," which set forth

[1] As Plaintiffs acknowledge, H&H follows state requirements as to whether consultations are provided synchronously (in real time) or asynchronously. In the few states where synchronous consultations are required, they are provided. Dkt. 28 ¶ 27 n.1.

"how we may collect, use and disclose your personal information." Bouzakis Decl., Ex. C-1, at 2-3. In turn, the Privacy Policy states that H&H "may provide personal information to marketing and advertising partners," including "sensitive information such as health data or information about your sex life to the extent it is not Protected Information." Bouzakis Decl., Ex. B-9 at 10. It also provides examples: "For example, if you view a webpage about balding or erectile dysfunction treatments, we may provide that information to an advertising partner who will then deliver advertisements to you on different websites based on your viewing activity." *Id.* And it discloses that "[t]hird party analytics and advertising companies also collect personal information through our website and apps including identifiers and device information (such as cookie IDs, device IDs, and IP address), geolocation data, usage data, and inferences based on and associated with that data." *Id.* at 11.

### D. H&H provides simple mechanisms to cancel.

Finally, Plaintiffs allege that H&H made cancellation burdensome or confusing, at least prior to 2023, at which point H&H introduced online cancellation across all states.[2] Dkt. 28 ¶ 44. But Plaintiffs acknowledge that H&H offered cancellation via multiple methods at all points: even before 2023, consumers could cancel over the phone, via email, or via online chat. *Id.* ¶¶ 44 n.2, 46, 55. After H&H broadly introduced online cancellation in April 2023, *id.* ¶ 44, the consumer would click on a button to "Manage Subscription," and, when taken to the next page, selected which of their subscription products they wished to remove, *id.* ¶ 52. After unchecking the box next to the relevant product, they clicked "Cancel subscription." *Id.* ¶ 53. In 2024, H&H added mobile app cancellation. *Id.* ¶ 59. At all times, consumers also retained the option to cancel by contacting customer support. *See id.* ¶ 26.

## III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

[2] Online cancellation was available in California beginning in 2019 (and converted to a single-click option in 2022, Dkt. 28 ¶ 55), consistent with California law; other states had no such requirement until later, at which point online cancellation was implemented. *Id.* ¶ 15, n.2.

662, 678 (2009) (citation omitted). Where a complaint includes allegations of fraudulent or deceptive conduct, such as a purported consumer misrepresentation, the allegations must also be stated with specificity, including the "who, what, where, when, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

## IV. ARGUMENT

### A. The Section 5 claims (Counts I-III) should be dismissed.

A deception claim under Section 5 of the FTC Act requires (1) a representation, omission, or practice, (2) that such act or omission is likely to mislead consumers acting reasonably under the circumstances, and (3) that such act or omission is material to the consumer transaction. *F.T.C. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). Failure to plausibly allege any element is fatal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs fail as to all three. And because their core theory is alleged deception, the claims sound in fraud and must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Vess*, 317 F.3d at 1103-05 (9th Cir. 2003); *F.T.C. v. D-Link Sys., Inc.*, 2017 WL 4150873, at *2 (N.D. Cal. Sept. 19, 2017). Plaintiffs fall well short of this standard.

#### 1. Plaintiffs fail to allege deceptive privacy practices (Count I).

***First***, Plaintiffs fail to plausibly allege a misrepresentation as to H&H's data privacy practices. Plaintiffs contend that H&H misled consumers by representing that it would not share certain customer information "with third-party Advertising Platforms." Dkt. 28 ¶ 87. But Plaintiffs have not identified instances of H&H actually making such representations.

Plaintiffs make four allegations regarding "privacy" or "discreetness" representations: (1) that H&H included an FAQ-type statement on one of its websites, until August 2023, that customer records are "only accessed by the medical providers managing your care," Dkt. 28 ¶ 62; (2) that H&H used an unspecified online advertisement to promote its "100% online, private, and secure process," *id.* ¶ 63; (3) that H&H used an unspecified offline advertisement to promote its "private" platform allowing treatment to be done "privately," *id.* ¶ 65; and (4) that H&H sponsored influencers who created at least two posts calling H&H services "discreet," *id.*

¶ 64. But none of these allegations shows a misrepresentation regarding H&H's *data privacy practices*, which are the subject of Plaintiffs' Section 5 claim. Rather, each statement, on its face, concerns the privacy or discreetness of H&H's online platform for obtaining medical treatment.

Specifically, the alleged advertising and influencer posts suggest that H&H's online treatment "process" and "platforms" are private — a widely perceived advantage of obtaining treatment online rather than through an in-person visit. *See id.* ¶¶ 63-65. The H&H FAQ, which has not been visible since August 2023, likewise addresses a potential concern about who has authorization to view medical records. *See id.* ¶ 62. It says nothing about the sharing of other categories of information, much less the sharing of data with third-party advertisers. On its face, any representation in the FAQ is about *online platform security*. In sum, H&H represented that its customers could obtain treatment discreetly and privately. Plaintiffs do not plausibly allege that *this* representation is false. *See* Dkt. 28 ¶¶ 67-71.

Further, Plaintiffs *cannot* allege that H&H's representations regarding "privacy" or "discreetness" are false, because an abstract sense of privacy or discreetness in a consumer transaction is a non-actionable "general, subjective" characteristic. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). That treatment can be obtained "discreetly" or "privately" online is not a "specific . . . assertion[]" with an objectively quantifiable metric. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("[M]isdescriptions of *specific or absolute* characteristics are actionable." (emphasis added)). The statement's accuracy depends on an individual's preferences and beliefs. For this reason, representations of this kind cannot support a Section 5 claim. *Cf., e.g.*, *id.* ("exaggerated advertising" is not actionable); *Newcal*, 513 F.3d at 1053 (representing that customers receive "low costs" and "flexibility" is not actionable); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (representing "trust," "diligence," and "compliance" is not actionable). The rule applies equally to general assertions and commitments regarding "privacy." *See, e.g.*, *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 962 (N.D. Ill. 2024); *Mehta v. Robinhood Fin.*

*LLC*, 2021 WL 6882377, at *10 (N.D. Cal. May 6, 2021).

Furthermore, Plaintiffs' allegations are defective for failure to satisfy the specificity requirement of Rule 9(b) — a rule that helps weed out claims based on immaterial and non-actionable assertions of deception. *Vess*, 317 F.3d at 1104. Plaintiffs do not allege the necessary circumstances of H&H's supposed misrepresentations, Fed. R. Civ. P. 9(b), including the location, placement, visibility, or audience of the statements, *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). In large part, Plaintiffs do not even mention a time or means of distribution. *See* Dkt. 28 ¶¶ 63, 65. Absent such facts, the complaint does not plausibly allege that any of H&H's statements is misleading. *See Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001). For this additional reason, this Section 5 claim should be dismissed.

***Second***, Plaintiffs do not allege a misrepresentation on which a reasonable consumer is likely to rely. *Stefanchik*, 559 F.3d at 928. Plaintiffs cherry-pick four context-free statements about privacy and discretion in the abstract, aiming to manufacture a narrative about H&H's privacy commitments to its customers. But Plaintiffs omit that *H&H has a detailed Privacy Policy* that is clearly disclosed. *See* Bouzakis Decl., Exs. A-B. Data-sharing practices are not made through third-party influencer videos, online ads, and an unrelated FAQ on one H&H page from August 2023. They are disclosed on the platform, unmistakably, for all to see. *See* Bouzakis Decl. at ¶¶ 4-5 & Ex. A. All customers, indeed all visitors to the H&H platform, are alerted to them. *See id.*

The H&H Privacy Policy clearly discloses the existence of the third-party advertising Plaintiffs are complaining of. The Policy states that H&H "will collect personal information," including "contact information" (*e.g.*, personal email address) and "usage data" (*e.g.*, "pages you viewed" and "how long you spent on a page"). *See* Bouzakis Decl., Ex. B-9, at 5. The Policy further notes that usage data "may be sensitive personal information if it relates to your browsing activity on health-related pages," such as "the fact that you visited a page that relates to a specific product or treatment." *Id.* The Policy then discloses that contact information and usage data is used for, as relevant here, "Marketing" and "Advertising," with yet another warning that the data

at issue may include "health data." *Id.*

In this context, even if Plaintiffs plausibly identified a misrepresentation, it could not support a Section 5 claim. A reasonable consumer cannot be misled about H&H's privacy practices when the actual policy, shown to all website visitors, plainly discloses the very conduct Plaintiffs challenge. *See, e.g.*, *Hammerling v. Google, LLC*, 2024 WL 937247, at *1 (9th Cir. Mar. 5, 2024); *Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 892 n.38 (C.D. Cal. 2013). For this reason too, the claim should be dismissed.

***Finally***, Plaintiffs fail to allege materiality. An alleged misrepresentation is material "[i]f consumers would have chosen differently but for the deception." *F.T.C. v. Univ. Premium Servs., Inc.*, 2007 WL 9728965, at *2 (C.D. Cal. Feb. 21, 2007). Plaintiffs make no such allegation in their complaint, except in the most conclusory fashion. Dkt. 28 ¶ 84. Nor do they offer any basis for inferring that a reasonable consumer would have acted differently in the absence of the FAQ response, the two unspecified advertisements, or the two influencer posts to which Plaintiffs object. The claim should be dismissed for this additional reason.

**2. Plaintiffs fail to allege deception regarding the disclosure of data-sharing with advertisers (Count II).**

Count II rehashes Count I, differing only in that Plaintiffs expressly style it as alleged deception about H&H's data-sharing with advertisers. The arguments against Count I apply also to Count II, and with even greater force. Plaintiffs do not identify any H&H representation concerning its data-sharing with advertisers. And as noted, H&H's Privacy Policy explicitly discloses its data-sharing practices, yet the complaint omits the Policy despite the FTC being fully aware of it given their three-year investigation. *See* Bouzakis Decl., Exs. A-B. There is no misrepresentation. There is no plausible reliance. And there is no plausible allegation of materiality. Dkt. 28 ¶ 87. This claim should be dismissed.

**3. Plaintiffs fail to allege deceptive intake practices (Count III).**

***First***, Plaintiffs do not allege a plausible misrepresentation regarding H&H's intake practices. Plaintiffs attribute three overlapping representations to H&H: that after submitting the

Intake Flow, a customer would have a "dialogue" with a provider about treatment; that a customer submitting a request was not agreeing to make payment or start a subscription; and that a customer would have a further opportunity to provide or withdraw consent before making payment or starting a subscription. Dkt. 28 ¶ 89. In sum, Plaintiffs contend that H&H told customers they would not be charged or subscribed until first speaking with a provider and having an opportunity to withdraw. *See id.* But the H&H Intake Flow Plaintiffs cite says no such thing. *See id.* ¶¶ 25-27.

Plaintiffs rely primarily on references to a free "visit," free "diagnosis," or a free "consultation." *Id.* ¶¶ 22-25. According to Plaintiffs, such statements promise a live "dialogue" and an opportunity to potentially withdraw from the transaction.[3] *Id.* ¶ 89. But none of these statements promises any such "dialogue" with a provider before a prescription issues. Plaintiffs insist on a promise H&H did not make, and one that would make no sense for an online platform designed to eliminate the potential discomfort of in-person interaction regarding medical treatment. Completing the intake and submitting it to a medical provider *is* the "visit," as the payment page again makes clear when reminding customers of the next step. *Id.* ¶ 26 ("Next, we'll send your visit to a provider for assessment."). Likewise, "consultation" does not require an in-person interaction and an opportunity to withdraw.[4] *See, e.g.*, Consultation, *Black's Law Dictionary* (12th ed. 2024) ("1. The act of asking the advice or opinion of someone . . . .").

Plaintiffs' allegations regarding the Intake Flow fare no better. After selecting a preferred treatment and shipment cadence, the endpoint of the H&H Intake Flow is a payment page. *Id.* ¶ 26. This payment page repeatedly, and accurately, points to payment and subscription as the next step after provider review. As Plaintiffs note, the payment page promises "Pay $0 today"

[3] Further, to the extent these allegations concern representations made outside the H&H Intake Flow, Plaintiffs provide no meaningful context for them. *See* Dkt. 28 ¶¶ 22-24. They therefore fall short of the Rule 9(b) pleading requirements and cannot be used to support Plaintiffs' claim.

[4] Where state law requires, H&H does provide "synchronous consultation," or a real-time consultation involving both the provider and the prospective patient. *See supra* section II.B. Plaintiffs acknowledge that most states do not require real-time consultations, Dkt. 28 ¶ 27 n.1, and thus most states *allow* the "asynchronous consultations" H&H employs, and which Plaintiffs are now calling deceptive.

and “You will only be charged if prescribed.” *Id.* That statement is accurate, and Plaintiffs do not allege otherwise. The page states, “you won’t be charged *until prescribed*.” *Id.* (emphasis added). Again accurate. “Cancel anytime.” *Id.* Again accurate, and confirmation that the next step, if prescribed, is the start of a subscription. At bottom, the payment page further states, “Important: By clicking ‘Pay $0 today’ you agree that: If prescribed medication, you . . . will be charged $147 for your first 90 days supply.” *Id.* That statement accurately reflects a particular customer’s subscription preferences, as selected during intake. The payment page further states, “Your prescription will be automatically refilled by a partner pharmacy. . . .” *Id.* Again, the statement is accurate, and confirms that the next step, if prescribed, is the start of a subscription.

In sum, taking Plaintiffs’ allegations as true, there is no misrepresentation. For this reason alone, the claim should be dismissed.

***Second***, even assuming a misrepresentation, Plaintiffs do not allege one likely to mislead a reasonable consumer. Plaintiffs’ own allegations show that the Intake Flow expressly discloses to customers all of the supposedly “hidden” terms. Customers choose the type of treatment they are interested in, select the cadence of their shipments, see the price of each of those shipments, and — before they proceed — are informed that a subscription will commence and subsequently continue upon their submission of the intake information. *See supra* section II.B. Plaintiffs do not and cannot plausibly allege that, in light of H&H’s actual disclosures, a reasonable customer would understand H&H to be offering something other than signing up for a subscription. The claim should be dismissed for this additional reason.

**4. Plaintiffs allege no grounds for relief, foreclosing all Section 5 claims.**

Finally, setting aside the elements of a Section 5 claim, Plaintiffs also fail to plausibly allege any available relief, either retrospective or prospective.

As to retrospective relief, the FTC has no authority to pursue monetary relief. *See AMG Cap. Mgmt., LLC v. Fed. Trade Comm’n*, 593 U.S. 67, 75 (2021). Its only option is to pursue civil monetary penalties, which it does not seek to recover. *See* Compl. ¶¶ 135-36 & Prayer ¶¶ B, D (only alleging civil penalties for “Plaintiff States”). Further, civil penalties are available only

where the defendant acted with actual or constructive knowledge that its conduct was "unfair or deceptive and . . . prohibited" by law. 15 U.S.C. § 45(m)(1)(A). Plaintiffs do not allege the requisite knowledge here. In the absence of knowledge, there is no basis for civil penalties.

As to prospective relief, the FTC lacks standing because there is no plausibly alleged risk of future harm. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). Just the opposite, in fact. Plaintiffs' allegations of privacy-related issues focus on a narrow timeframe ending in September 2023, Dkt. 28 ¶ 69, and Plaintiffs affirmatively allege that the conduct they complain of resolved in May 2024, *id.* ¶ 120. Plaintiffs' allegations regarding intake, payment, and cancellation issues likewise appear to be resolved as of 2025. *Id.* ¶¶ 31-32, 44. Nowhere do Plaintiffs allege unlawful conduct that is ongoing and likely to continue into the future, as necessary to obtain injunctive relief.

Without any available relief, Plaintiffs' Section 5 claims present an abstract dispute that is not redressable in court, and that Plaintiffs therefore lack standing to pursue. The Section 5 claims should be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction.

**B. The ROSCA claims (Counts IV-VI) should be dismissed.**

ROSCA makes it unlawful "to charge . . . any consumer for any goods or services" sold in an online transaction "through a negative option feature," except where three conditions are met. 15 U.S.C. § 8403. Accordingly, as a threshold matter, ROSCA does not apply in the absence of a "negative option feature." If ROSCA applies, first the seller must "clearly and conspicuously disclose[] all material terms." 15 U.S.C. § 8403(1). Second, the seller must "obtain a consumer's express informed consent" before processing payment. 15 U.S.C. § 8403(2). Third, the seller must "provide[] simple mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403(3). Plaintiffs allege that H&H transacted through negative-option features and that it failed all three conditions for avoiding ROSCA liability. Plaintiffs' allegations fall short on every point.

### 1. Plaintiffs do not allege a negative-option feature, foreclosing all ROSCA claims.

As a threshold matter, all of Plaintiffs' ROSCA claims fail because Plaintiffs do not allege that H&H employed a negative-option feature in its consumer contracts. ROSCA applies only to an online transaction effected "through a negative option feature." 15 U.S.C. § 8403. A negative-option feature is "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w). In other words, it is a renewal without an affirmative act, where a contract at the end of its term is revived unless the customer opts out. *See, e.g.*, *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 761 (C.D. Cal. 2020) (negative-option contract existed where the "automatic renewal policy" ensured "a subscription automatically renews when its [12-month] period was set to end").

Nowhere in their complaint do Plaintiffs allege a contract with a provision of this kind. Indeed, the term scarcely appears in the complaint, and as to H&H only in the most conclusory fashion. First, Plaintiffs allege that H&H "offers . . . treatments on a negative-option basis." Dkt. 28 ¶ 14. Second, Plaintiffs allege that H&H "charged consumers for negative option prescription subscriptions." *Id.* ¶ 78. On these threadbare allegations Plaintiffs build their entire ROSCA case. *See id.* ¶¶ 94, 97, 99, 101. Plaintiffs cannot satisfy their pleading burden simply by reciting the legal elements. *Twombly*, 550 U.S. at 555. For this reason alone, the ROSCA claims are defective and must be dismissed.

Plaintiffs' failure to plausibly allege this predicate of their ROSCA claims is troubling given that H&H has used different contracts at different times and for different products. Plaintiffs do not identify specific contracts with a supposed negative-option feature, even after the FTC's three-year investigation. This defect denies H&H "fair notice" of the substance of Plaintiffs' ROSCA claims "and the grounds upon which [they] rest[]." *Twombly*, 550 U.S. at 555. And the problem is compounded by the fact that the historical H&H contracts underlying the FTC's investigation and allegations here *do not contain a negative-option feature*. *See* Bouzakis Decl. at ¶¶ 8-9 & Exs. D-E. Rather, they are fixed-term contracts requiring monthly

installment payments. *See id.*[5]

The law on this point is unambiguous, despite the FTC's overreach. A provision for installment payments is not a negative-option feature, and so ROSCA does not apply. Installments are simply a kind of payment plan for an ordinary contract with a finite term, paying seriatim rather than upfront. A negative-option feature is a means of forming a new contract — "acceptance of [an] offer," as the regulation underscores, 16 C.F.R. § 310.2(w) — but by acquiescence rather than an affirmative act. Courts have recognized this distinction. *See United States v. Adobe, Inc.*, 791 F. Supp. 3d 966, 983 (N.D. Cal. 2025) (describing an annual contract paid in monthly installments as renewed "at the end of the year," and thus a negative-option contract in the event of auto-renewal *at that time*); *see also MyLife.com*, 499 F. Supp. 3d at 761. And so has the FTC, which has consistently invoked ROSCA for opt-out renewals, not installment payments.[6] Plaintiffs are now attempting to expand ROSCA's reach in a way the law does not allow and no court has authorized. Their ROSCA claims fail accordingly.

**2. Plaintiffs fail to allege a claim based on clearly and conspicuously disclosing material terms or lack of informed consent (Counts IV-V).**[7]

Plaintiffs must sufficiently allege both (1) a failure to properly disclose, and (2) materiality of the allegedly undisclosed terms under ROSCA. Plaintiffs fail on both points.

ROSCA does not define the phrase "clearly and conspicuously." *See* 15 U.S.C. § 8403. However, in the context of other consumer statutes, "clearly" refers to a disclosure that is "readily understandable." *F.T.C. v. Uber Techs., Inc.*, 830 F. Supp. 3d 912, 928 (N.D. Cal. 2026)

[5] Nor are "negative-option features" unlawful under ROSCA. To the extent H&H employed such contracts, it has done so in compliance with its legal obligations. *See also infra* section IV.B.2-3.

[6] *See, e.g., F.T.C. v. Health Formulas, LLC*, 2015 WL 2130504 at *16 (D. Nev. May 6, 2015); *F.T.C. v. Bunzai Media Grp., Inc.*, 2015 WL 5305243 at *4-5 (C.D. Cal. Sept. 9, 2015); *F.T.C. v. Triangle Media Corp.*, 2018 WL 4051701 at * 1 (S.D. Cal. Aug. 24, 2018); *F.T.C. v. AAFE Prods. Corp.*, 2017 WL 3896763 (S.D. Cal. 2017); *see also* James Decl., Ex. F (Concurring Statement of Commissioner Christine S. Wilson, File No. 182 3127 (Apr. 20, 2020)), at 6 (rejecting the application of ROSCA because "the . . . consumer accepts the lease offer at the start of the term and agrees to the recurring charges for the length of the lease").

[7] Plaintiffs state no allegations specific to their informed consent theory. *See* Dkt. 28 ¶¶ 99-100; *see also id.* at p. 9 (equating the claims). The analysis of these counts therefore overlaps. *F.T.C. v. Doxo, Inc.*, 771 F. Supp. 3d 1162, 1181 (W.D. Wash. 2025); *F.T.C. v. Dave, Inc.*, 2025 WL 2698698, at *16 (C.D. Cal. Sept. 12, 2025).

(citing case law concerning FCRA and TILA). And "conspicuously" refers to a disclosure that is "readily noticeable." *Id.* Plaintiffs contend that H&H falls short of this standard for the same reasons previously stated: for supposedly failing to inform customers properly about their initial payment, about their ongoing subscription, and about the sharing of personal information with third-party advertisers. For the reasons previously stated, Plaintiffs do not plausibly allege a lack of disclosure on these subjects.

With respect to customers' initial payment and subscription, H&H's Intake Flow is abundantly clear, both as alleged by Plaintiffs and as properly incorporated by reference. Customers select a preferred treatment plan and shipping cadence, which determines the price they will pay. *See* Dkt. 28 at ¶ 19. Customers enter their shipping address because they will, if prescribed, be shipped medication. *Id.* The checkout page displays the price, *id.* at ¶¶ 19, 26, and the customer must submit their billing information, *id.*, because they will be charged if prescribed. And customers are repeatedly told that the next step after submitting their request is provider review and a prescription if appropriate, to be shipped at the selected cadence. *See, e.g.*, Dkt. 28 ¶ 26 ("[Y]ou won't be charged *until prescribed*." (emphasis added)); *id.* ("If prescribed," the customer "will be charged"); *id.* ("Your prescription will be automatically refilled . . . ."); *id.* ("Your subscription will renew and your prescription will be refilled unless you cancel at least 2 days before the next processing date."). This language is "readily understandable" and repeated throughout the intake process. *Uber*, 830 F. Supp. 3d at 928; *Snyder v. G6 Hosp. LLC*, 2025 WL 2426613, at *4 (C.D. Cal. Aug. 18, 2025).

The Intake Flow is also conspicuous. A customer cannot submit a request for treatment, and initiate their subscription, without clicking through pages with repeated reminders, both express and implicit, of the end result of the process: If prescribed, the customer will be charged for medication, with the subscription recurring as often and for as long as *the customer specifically requested* (up to 12 months). This disclosure is more than sufficiently noticeable. *See Strubel v. Cap. One Bank, N.A.*, 179 F. Supp. 3d 320, 326 (S.D.N.Y. 2016).

With respect to the H&H data-sharing practices, the actual H&H policy on this subject is

again both readily understandable and readily noticeable. The H&H Privacy Policy is simple and direct, and it alerts consumers multiple times that third-party advertisers may receive the data Plaintiffs put at issue in their complaint. *See* Bouzakis Decl., Ex. B. The Privacy Policy is also presented to every customer, and even to non-customers visiting the H&H website. *See* Bouzakis Decl. at ¶¶ 4-5 & Ex. A. It is more than sufficiently "noticeable."

Further, with respect to "material terms," Plaintiffs again stretch ROSCA far beyond its statutory limits. ROSCA does not define "material terms." But the statute makes clear that it does not govern every conceivable agreement or contractual term; it governs "transaction[s] effected . . . *through a negative option feature*." 15 U.S.C. § 8403 (emphasis added). For such transactions, a person must disclose "all material terms *of the transaction*." 15 U.S.C. § 8403(1) (emphasis added); *see also Fed. Trade Comm'n v. Dave, Inc.*, 2025 WL 2698698, at *13 (C.D. Cal. Sept. 12, 2025). Accordingly, to be "material" for ROSCA purposes, a term must, at a *minimum*, be part of a transaction allegedly subject to a negative-option feature.

Under the statute's plain language, the H&H privacy terms, which Plaintiffs invoke to support their claim, do not qualify. Dkt. 28 ¶ 97. The H&H Privacy Policy is disclosed to, and applies to, all website visitors, irrespective of whether they transact for treatment through the H&H platform. *See* Bouzakis Decl. at ¶¶ 4-5 & Ex. A. Data may be gathered regardless of whether there is an underlying transaction. And the rules for that data are set by the Privacy Policy regardless of whether there is an underlying transaction. *See id.* The H&H privacy terms are not part of any transaction allegedly subject to a negative-option feature; they cannot possibly be "material" to such a transaction.

The case law on this point is unanimous: material terms may be those governing the negative-option feature itself, or those of the transaction subject to the negative-option feature. *Adobe*, 791 F. Supp. 3d at 984; *Dave*, 2025 WL 2698698, at *14. But no case applies ROSCA as Plaintiffs ask, to police terms that exist independent of an alleged negative-option transaction. For this additional reason, H&H's alleged privacy practices cannot give rise to a ROSCA claim.

### 3. Plaintiffs fail to allege a claim based on the absence of a simple cancellation mechanism.

Finally, Plaintiffs contend that H&H's cancellation practices fall short of ROSCA's requirement that cancellation be "simple." 15 U.S.C. § 8403(3). Specifically, Plaintiffs allege that before April 2023, H&H improperly required customers to contact customer service and authenticate themselves. Dkt. 28 ¶¶ 45-47. And for the period after April 2023, Plaintiffs allege that H&H required customers to cancel through an online cancellation flow with multiple steps. *Id.* ¶¶ 50-55. According to Plaintiffs, the supposedly simplest option — a one-click cancellation feature — was only made available for customers in certain jurisdictions, including California. *Id.* ¶ 44 n.2.

Even taken as true, these allegations do not support a ROSCA claim. Courts construe a "simple" cancellation mechanism as one that is not "difficult, costly, or time consuming," looking in particular at whether the cancellation mechanism is "at least as simple as the mechanism the consumer used to initiate" the subscription. *Adobe*, 791 F. Supp. 3d at 987. Plaintiffs' own complaint confirms that H&H meets this standard. Signing up for an H&H subscription requires entering considerable personal information, across multiple pages, and submitting it to a medical service provider. Dkt. 28 ¶¶ 25-27. Cancelling has always been considerably simpler, easier, and less time-consuming. Before April 2023, cancelling required contacting customer service with an account number and birthdate — minimal information when authenticating a request to cancel medication. *Id.* ¶¶ 44-49. Starting in April 2023, a consumer could also cancel online, a process with far fewer steps than signup. *Id.* ¶¶ 50-54.

Behind this ROSCA claim, Plaintiffs' real objection appears to be that H&H's cancellation process could be *simpler*, like the one-click cancellation option deployed in California. *See id.* ¶ 44 n.2. But ROSCA does not create a claim wherever a cancellation policy could arguably be *simpler*. And ROSCA does not prevent H&H from establishing alternative, equally lawful cancellation options. This claim should be dismissed.

## C. The California claims (Counts VII-VIII) should be dismissed.

Count VII is a claim under California's False Advertising Law ("FAL"). Count VIII is a

claim under California's Unfair Competition Law ("UCL"), proceeding under the unlawfulness, fraud, and unfairness prongs. Both California claims rest on the same defective pleadings as the federal claims, and should likewise be dismissed.

**1. Plaintiffs cannot plausibly identify unlawfulness under the UCL.**

Plaintiffs propose six theories of unlawfulness: violations of the FTC Act; ROSCA; the FAL; California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17601-17602; and the California constitutional and common-law right to privacy, Cal. Const. art I, § 1. Dkt. 28 ¶¶ 114-118. The Section 5 and ROSCA theories fail for the reasons previously stated. *See supra* sections IV.A-B. The FAL theory overlaps with the UCL unfairness theory, and fails for the reasons stated below. *See infra* section IV.C.2. Finally, Plaintiffs' remaining theories of unlawfulness are largely derivative of other claims and likewise fail.

The ARL imposes conditions analogous to those in ROSCA where contracts have "automatic renewal" or "continuous service" provisions. Cal. Bus. & Prof. Code § 17602. Automatic renewal refers to agreements "automatically renewed at the end of a definite term for a subsequent term." Bus. & Prof. Code § 17601(a)(1). Continuous service refers to agreements "in which a paid subscription or purchasing agreement continues until the consumer cancels the service." Bus. & Prof. Code § 17601(a)(5). For the reasons stated in connection with ROSCA, Plaintiffs do not plausibly allege that H&H uses such provisions or agreements, *see supra* section IV.B.2, or that H&H's disclosures or cancellation practices are inadequate, *see supra* section IV.B.2-3. There is therefore no predicate unlawfulness.

Pleading a violation of the constitutional right to privacy requires plausible allegations of (1) "a specific, legally protected privacy interest," (2) "a reasonable expectation of privacy on [the individual's] part," and (3) an invasion "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 35-38 (1994). Pleading a common-law intentional intrusion upon seclusion requires (1) a reasonable expectation of privacy, (2) an intentional intrusion upon it, (3) an intrusion that would be highly offensive to a reasonable

person. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Plaintiffs make little effort to separately plead a privacy violation, resting instead on the notion that consumers were unaware of the "secret disclosure" of data to third-party advertisers. Dkt. 28 ¶ 118. But for the reasons previously stated in connection with Counts I and II, H&H never hid its policies. On the contrary, the H&H Privacy Policy, disclosed to every website visitor, repeatedly states that certain data may be shared for advertising and marketing — including the data allegedly shared here. *See supra* sections II.B-C, IV.A.1-2. There is no expectation of privacy and predicate violation for the UCL. There is no plausible theory of unlawfulness.

**2. Plaintiffs fail to allege fraud or unfairness for UCL or FAL purposes.**

Plaintiffs' remaining California claims fall together. Because Plaintiffs' fraud and unfairness theories under the UCL are identical, the unfairness analysis merges with the fraud analysis. *See NorthBay Healthcare Grp. v. Blue Shield of Cal.*, 342 F. Supp. 3d 980, 988 (N.D. Cal. 2018). The FAL and the UCL's fraudulent prong likewise "substantively overlap," so "[the] plaintiff's burden under these provisions is the same." *Sanchez v. Nurture, Inc.*, 626 F. Supp. 3d 1107, 1115 (N.D. Cal. 2022).

That burden is heavy. Plaintiffs "must point to a misrepresentation with particularity and plead that [it] was an immediate cause of the injury-producing conduct." *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (citations omitted). The misrepresentation must be one by which "members of the public are likely to be deceived." *Sanchez*, 626 F. Supp. 3d at 1115. Because the claim deals with fraud, Rule 9(b) applies. *Vess*, 317 F.3d at 1104.

None of Plaintiffs' three theories is plausibly pleaded, let alone pleaded with particularity. Plaintiffs contend that H&H misled customers as to being enrolled in and charged for a subscription plan. Dkt. 28 ¶¶ 119, 121-122. As discussed above, Plaintiffs' allegations support nothing of the sort, and the omitted portions of the H&H Intake Flow underscore the point. *See supra* sections II.B-C, IV.A.3. Plaintiffs contend that H&H misled customers as to its data-sharing practices. Dkt. 28 ¶ 120. Again, Plaintiffs' allegations do not support the claim, and the omitted H&H Privacy Policy forecloses it. *See supra* sections II.B-C, IV.A.1-2. Finally,

Plaintiffs contend that H&H failed to provide a simple cancellation mechanism. Dkt. 28 ¶ 123. As discussed, H&H did provide a simple cancellation mechanism, consistent with the only identified standard for doing so under ROSCA. *See supra* section IV.B.3. And the theory of fraudulent conduct fails given that Plaintiffs acknowledge that the supposedly preferable cancellation mechanism — the one-click feature — *was* deployed in California. Dkt. 28 ¶ 44 n.2.

In the absence of any plausible allegations of fraudulent conduct, the remaining California claims fail.

### D. The Utah claim (Count IX) should be dismissed.

The Utah Consumer Sales and Practices Act bars "deceptive act[s] or practice[s] in connection with a consumer transaction." Utah Code § 13-11-4. In support of their claim, Plaintiffs repeat the same theories pertaining to data-sharing practices, Dkt. 28 ¶ 132(A)-(E), enrollment in and charges for a subscription, *id.* ¶ 132(F)-(K), and the cancellation process, *id.* ¶ 132(L). Plaintiffs do not make any substantive allegations specific to the Utah claim. *Id.* ¶¶ 132-133. Accordingly, for the reasons stated previously, Plaintiffs' allegations do not support their theories of deception. *See supra* sections IV.A-B. The Utah claim should be dismissed.

### E. Plaintiffs lack standing to pursue injunctive relief.

For the reasons previously stated with respect to the FTC Act, Plaintiffs have failed to plausibly allege any risk of prospective harm. *See supra* section IV.A.4. Plaintiffs therefore lack standing to pursue injunctive relief on any claim. *Bates*, 511 F.3d at 985. All claims must be dismissed under Rule 12(b)(1) to the extent they are for injunctive relief.

## V. CONCLUSION

For the foregoing reasons, all of Plaintiffs' claims should be dismissed.

Dated: October 22, 2026

KEKER, VAN NEST & PETERS LLP

By: */s/ Benjamin Berkowitz*

BENJAMIN BERKOWITZ
NICHOLAS S. GOLDBERG
MAYA JAMES
NIALL M. FRIZZELL
EMILY HASSELBERG
SARA R. FITZPATRICK

Attorneys for Defendant
HIMS & HERS HEALTH, INC.